NO. 07-94-0166-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

MAY 30, 1996

_____

PATRICIA CARMAN, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 364TH JUDICIAL DISTRICT COURT OF LUBBOCK COUNTY;

NO. 92-415352; HONORABLE BRADLEY S. UNDERWOOD, JUDGE

_____

Before DODSON, BOYD and QUINN, JJ.

In eight points of asserted error, appellant Patricia Carman challenges her conviction of intentionally or knowingly, by omission, causing serious bodily injury to a child and the consequent jury-assessed punishment of 50 years confinement in the Texas Department of Criminal Justice, Institutional Division. Appellant's prosecution arose out of the death of her seven-year-old stepdaughter, Stephanie Carman, on June 8, 1992. The State alleged her death was the result of malnutrition. She and her husband, Steven Carman, Stephanie's natural father, were charged and tried before a jury in a joint trial that lasted five weeks. The trial involved extensive expert testimony bearing on Stephanie's condition and the cause of her death. For reasons we later express, we affirm the judgment of the trial court.

In her eight points, appellant contends 1) the evidence is legally insufficient; 2) the evidence is factually insufficient; 3) the trial court erred in admitting Steven's statement in violation of appellant's Sixth amendment right of confrontation; 4) she was entitled to a new trial based on misconduct of a juror; 5) there was improper admission of reputation evidence at the punishment phase; 6) the trial court erred in refusing to instruct the jury on the lesser-included offense of endangering a child; 7) the trial court erred in admitting opinion testimony by an unqualified expert witness; and 8) the trial court erred in refusing an instruction on criminal negligence.

The nature of appellant's challenge in her first two points requires us to recount the relevant evidence in some detail. It also requires us to review the standards by which such challenges are measured. When reviewing the legal sufficiency of the evidence, we are to apply the standard articulated in *Jackson v. Virginia*, 433 U.S. 307, 99 S.Ct 2781, 61 L.Ed.2d 560 (1979), and *Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App. 1993). Under this standard, evidence is legally sufficient to sustain a conviction if, when viewed in the light most favorable to the verdict, a rational factfinder could find the essential elements of the offense beyond a reasonable doubt. *Jackson*, 433 U.S. at 319. This standard of review is applied whether the conviction is based on direct or circumstantial evidence. *Alexander v. State*, 740 S.W.2d 749, 757 (Tex.Crim.App. 1987), *cert. denied*, ___ U.S. ___, 114 S.Ct. 1869, 128 L.Ed.2d 490 (1994).

The recent Court of Criminal Appeals decision in *Clewis v. State*, No. 450-94 (Tex.Crim.App. January 31, 1996), instructs that when the factual as well as the legal sufficiency of the evidence is challenged, if, after applying the *Jackson v. Virginia* test we determine the

2

evidence was legally sufficient, we must proceed to examine the evidence without the prism "in the light most favorable to the prosecution." *Clewis*, slip op. at 11. We are, rather, to examine all the evidence, and if our review convinces us that the jury verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, we remand the case to the trial court for retrial before another jury. *Id.*

We are cautioned to give proper deference to the decision of the jury and not to attempt to reweigh the evidence and set aside a jury verdict merely because a different result seems more reasonable. Indeed, the *Clewis* court quoted and adopted the requirement set out by the Texas Supreme Court in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986), that courts of appeals, when *reversing* on factual insufficiency grounds, must detail the evidence relevant to the issue in consideration and clearly state why evidence is so insufficient that the jury's verdict is manifestly unjust, why it shocks the conscience or clearly demonstrates bias, and in what regard the contrary evidence outweighs the evidence in support of the verdict. *Clewis,* slip op. at 14. It is under the standards for both legal and factual sufficiency that we review the evidence in this case.

The State presented the testimony of Wilma Manning, an employee of the Texas Department of Protective Services. She described a telephone call she received from appellant between 4:00 and 4:30 p.m. on June 8, 1992. According to Manning, appellant repeatedly described Stephanie's medical and mental problems, including an eating disorder, compulsive behavior and Attention Deficit Disorder. Manning described appellant's speech as loud and continuous, with little opportunity for Manning to talk. In response to Manning's suggestion to take Stephanie to a doctor, appellant expressed concern about being accused of misconduct. The

3

call ended when Manning heard a male voice yelling and appellant said, "Oh, my God, I have got to call 911," at which time appellant hung up the phone.

The State also presented the testimony of the paramedics who initially responded to appellant's 911 call. Lloyd Cody, the first paramedic, described Stephanie as "malnourished" because her eyes were sunken and all of her ribs were clearly visible. His initial opinion was that she had some serious medical problem or had not been eating. When he first saw her, Stephanie was not breathing and her heart was not beating. Cody described the room Stephanie was in as "barren" with just a few articles of furniture. When shown photographs of the room taken on June 10, 1992, he said the toys and some of the furniture shown in the photographs were not present on June 8 when he saw the room.

A second paramedic called by the State, Robert Mello, also described the room in which Stephanie was found as dark and barren with only a bed, a nightstand, some empty shelves and a chair. Mello's description of Stephanie was "emaciated," "like one of the kids from like a concentration camp or something." He characterized appellant as very calm. This description of appellant was not consistent with the EMS (emergency medical services) report written by paramedic Tommy Crawford which described appellant as distraught. Appellant told Mello that Stephanie had not been eating for two weeks. In his testimony, Mello described some of the medical procedures taken with Stephanie, including the administration of intravenous fluids (IV).

The State next called Jeanette Whalen, an officer with the Lubbock Police Department who responded to the Carmans' call for help. She also testified that many of the items in the photographs taken two days later, such as the dolls and other toys, were not present on June 8. She stated that the reason she remembered the toys shown in front of a window in some of the

4

photographs were not there on June 8 was because she specifically remembered another officer walking to the window and opening the blinds to provide more light for the EMS personnel; however, she did identify a dresser that Mello testified was not present as being in the room on June 8.

Whalen described appellant as crying but not hysterical. When Whalen sought to obtain some medical history, appellant told her that Stephanie suffered from Post-Traumatic Stress Disorder as a result of mistreatment by her natural mother. Appellant also related that she "had not been able to get Stephanie to eat at all" the previous week. Stephanie was taken to University Medical Center where she was soon pronounced dead. Because of the circumstances surrounding her death, an autopsy was requested by a Justice of the Peace.

Wayne Casey, another officer of the Lubbock Police Department and the principal investigator in the case, described his involvement beginning with his attendance at Stephanie's autopsy on the evening of June 8, 1992. In addition to Casey, others present at the autopsy were Sergeant Bill Hubbard, Dr. David Hoblit (who performed the autopsy), his assistant, an ophthalmologist, and Dr. Garcia, who had seen Stephanie as a patient on previous occasions. Casey described Stephanie as very thin with visible ribs and sunken eyes. Her skin was "very, very pale," she had abrasions and bruises on various parts of her body and very thin hair with some patches missing. It was his impression that she had a long term illness or had been abused.

Casey, Hubbard, and another officer went to the Carmans' home on June 10, 1992 to investigate her death. Granted permission to inspect the home, the officers noticed that both the door to Stephanie's room and the door to her closet had chain-type locks mounted very high on the doors, well out of a seven-year-old's reach. Hubbard took photographs of Stephanie's room.

The Carmans told the officers that Stephanie had been very disturbed and difficult to handle. They explained that several stains on the carpet were due to the fact that Stephanie would urinate and defecate in her room. The Carmans also provided the officers with a written record of what Stephanie had eaten the previous week, from Monday, June 1 through Saturday, June 6, with two notations labeled only Sunday and "Today, Mon." This information was written on an envelope postmarked in Hobbs, New Mexico on June 5, 1992.

Through Casey, the State introduced a chart that the family had on the wall of Stephanie's room that was used to record her height and weight. A notation on the chart showed that Stephanie weighed 57½ pounds when she was seven years and nine months old. At the time of her autopsy approximately a month later, Stephanie's weight was 43½ pounds. Concerning the toys he found in Stephanie's room, Casey described them as brand new. He also found additional new, unopened toys in her closet along with new dresses that still had store tags on them.

Casey interviewed and took written statements from appellant and Steven Carman. In appellant's statement, she described Stephanie as stubborn and willful and admitted that she had occasionally locked Stephanie in her room. Appellant also stated she had "used food items as an incentive with [Stephanie]." According to her, appellant had to "force feed [Stephanie] for about a week." Concerning the day that Stephanie died, appellant's statement described Stephanie as "mopey" as though she were seeking sympathy. The statement provided that Stephanie did eat some pudding while appellant's sister-in-law Carla was there that afternoon, and described the events that followed:

> [S]he got on the edge of the chair and just slid out of the chair and her butt hit the floor and she just went [] onto her back hard. She was just laying there looking. She didn't look like she was sick. She got up in that mopey kind of way and got some water. She did it like she was faking because she had faked it before.

6

. . .

Carla left and when I checked on Steph she was laying on her back in her room holding her knees in the air. I mixed an Ensure shake for her and I took it to her and she sat in her blue plastic chair. She drank a little of the shake and half a glass of water. I decided to take her to the hospital. I asked her if she was hurting anywhere but she wouldn't answer me. She was leaning in the chair. I was looking at her to see if she was faking. I told her if she didn't answer me I was going to take her to the hospital. She told me no, she was tired and wanted to rest. When I left the room she was still in the chair but was acting like she was fixing to get up. I called Christine at Social Service but she wasn't there but I talked to her supervisor. I was nervous that something was wrong, that Stephanie was faking it but the water and the fact she wouldn't answer me scared me and she was hurting but wouldn't tell me. She didn't appear sick. I'm not sure what I said. Steve came home while I was on the phone and walked in the back. He ran up the hallway and said, "call 911, I think she's dead." I dialed 911.

Casey admitted that although appellant had described using M&M candy as a reward when Stephanie would complete a school lesson, when he wrote the statement he only included that appellant used food as a reward and incentive. He did not record any part of appellant's oral statement and disagreed with the idea that a tape recording "would be a good way to check and make sure everything is accurate."

Casey also interviewed the couple's other daughter, Loretta Carman, while she was staying with family friends in New Mexico. Before that interview, the attorneys representing appellant and Steven Carman requested to listen to the interview by telephone, to have the interview recorded, or to allow JoAnn Jackson, the family friend with whom Loretta was staying, to be present. Casey refused all three requests. He described Loretta's responses during the interview as "coached." He said that she was flippant and used words that were not typical for her age but were used by her parents.

Casey also disagreed with the view, even if it came from Dr. Hoblit, that any of the bruises on Stephanie's body were natural rather than the result of abuse. On cross-examination,

7

Casey went so far as to say that it was possible for him to determine whether a child has been abused based on what is present in or absent from a child's room.

Stephanie's natural mother, Myrtis Carman, described Stephanie's early childhood. The State introduced several photographs of Stephanie which Myrtis identified. She characterized Stephanie as "chubby" in several of the photographs and denied ever giving Stephanie alcohol in her bottle so she would sleep. According to Myrtis, Steven Carman talked her into letting Loretta and Stephanie stay with him to attend school for one year. At the end of the year she reluctantly permitted Steven Carman and appellant to keep the girls.

The State called Tammy Fowler, a special education teacher at Parsons Elementary where Stephanie Carman attended school. Fowler taught a class designated as a "social adjustment" class for students diagnosed as emotionally disturbed. Fowler described Stephanie as a very sweet girl who loved attention. She felt that most of Stephanie's misconduct was an effort to get more attention from her. She said that Stephanie never had a problem with wetting her pants at school. The teacher said appellant was involved in Stephanie's education and would communicate with her on a regular basis; however, Fowler did not always agree with appellant's view of what was in Stephanie's best interest.

Fowler stated that she used food as part of a program of "rewards and consequences." This involved occasionally giving treats like candy to students for good work and making them complete projects before having lunch. She said that appellant instructed her not to allow Stephanie to participate in other student's birthday parties at school. While she was in Fowler's class, Stephanie usually brought her lunch to school. Sometimes it was just a sandwich with a note from appellant that Stephanie was not to have anything else.

The State presented several notes appellant had written to Fowler. These notes included requests that Fowler not give Stephanie rewards such as candy or small gifts (such as an eraser), or that Stephanie not brush her teeth at school because "this is very unsanitary with all the diseases going around." Another note instructed Fowler to limit the time in which Stephanie was allowed to eat her lunch stating, "She is very able to eat what I put in her lunch box within 15 to 30 minutes. She should not have any food left over. The only reason she would is she is being distracted from the task of eating - and she must be focused!!" Fowler also commented that appellant told her that they had guarded the refrigerator to keep Stephanie out of it.

In describing her opinion of the relationship between Stephanie and appellant, Fowler thought that Stephanie was somewhat afraid of appellant. She never saw the two touch each other and sometimes appellant was very abrupt with Stephanie. Stephanie was only in Fowler's class from August of 1992 to the following February, when the Carmans took her out of school to teach her at home.

The State next called Christy Brabec, a friend of Stephanie's older sister Loretta. Brabec described the two times she visited the Carmans' home. One occasion was to go swimming in the Carmans' swimming pool and another was a birthday party for Loretta. On the first occasion, Brabec was only in the house a few minutes but on the second occasion, she and other guests stayed overnight. Brabec said that she did not see Stephanie on either occasion but did see a door that was closed while she was there. She conceded that Stephanie could have been visiting one of her friends at the time.

Shelly Carman, Stephanie's cousin, related her experiences when visiting Stephanie's home. According to Shelly, Stephanie did not play with the other children and was not allowed

9

to eat with the family. She remembered appellant would fix a small plate for Stephanie after the others had eaten. Shelly also said that Stephanie did not participate with the rest of the family in opening presents on Christmas. Shelly also described playing with Stephanie in her room the Christmas before her death. She also averred that almost all the toys and furniture shown in the photographs taken June 10, 1992 were present the previous Christmas.

Harold Marlowe, a pharmacist at a pharmacy near the Carmans' home in June 1992, testified that appellant came to his store on June 3, 1992 and asked what to give her child who had not eaten in four days. Marlowe recommended Ensure, which appellant purchased. Apparently seeking to cast doubt on his memory concerning the date of the purchase, the defense produced a receipt dated June 8 showing the purchase of a case of Ensure from Marlowe's store and signed by appellant's mother, Phyllis Reynolds. The State next called Dominga Bates, who visited her mother, a neighbor of the Carmans, on a daily basis. She described seeing appellant and Steven Carman with their older daughter Loretta on many occasions, but she had never seen Stephanie with them.

The State also called Barbara Pence as an expert witness. Dr. Pence held a Ph.D. and is an associate professor of pathology in Lubbock. She studies and teaches nutrition. Dr. Pence began by explaining charts used by doctors to plot the growth of children. She described that in their early years children typically grow at a predictable rate and maintain an approximately constant position relative to their peers. A child whose size and weight put her in the 50th percentile at one year old would normally be expected to be very near the 50th percentile at six years old. According to Dr. Pence, a significant change in the percentile ranking of a child would indicate a problem of some type. The State produced a chart showing that Stephanie's weight at the time of her autopsy was below the 5th percentile based on her height. Dr. Pence also

reviewed medical records of Stephanie's growth from ages 10 months through 31 months. During that time the records indicated Stephanie was between the 80th and 95th percentile of weight for her height and that growth was normal.

Dr. Pence next discussed the process of malnutrition. She described two types of malnutrition which may both exist in varying degrees. The first, Marasmus, is a decrease in the total number of calories needed, the second, Kwashiorkor, is a severe protein deficiency. She described the symptoms of Marasmus as a "wasted" appearance where bones are clearly visible. This is a result of the body breaking down fat, and eventually muscle, for energy. Symptoms of Kwashiorkor include altered pigmentation of a person's hair, a buildup of fat in the liver, and anemia.

Dr. Pence examined the autopsy records and photographs and was questioned concerning her opinion of whether Stephanie suffered from malnutrition. Dr. Pence opined that Stephanie was "very poorly nourished" based on her physical appearance including visible bones, bruises and loss of hair. However, Stephanie's physical appearance was also consistent with other conditions, such as cancer. By using other information from the autopsy such as anemia, low blood protein levels and fat changes in the liver, she concluded that Stephanie was suffering from a combination of Marasmus and Kwashiorkor, and that it was the result of at least six months of malnutrition.

Dr. Pence described a syndrome called Psychosocial Deprivation Dwarfism where parents describe their children as eating excessively. Parents will restrict the child's diet to the point where the child becomes malnourished. The child will exhibit behavioral problems as a result of inadequate nutrition often leading to further restrictions of food.

11

Over appellant's objection, Dr. Pence testified that a sudden increase in food intake could cause a severely malnourished person to experience heart failure. This is the result of a weakened heart being unable to supply the blood needed by the stomach and intestines. The autopsy indicated that Stephanie had a significant amount of food in her stomach when she died. In her review of the blood analysis from the autopsy report, Dr. Pence noted several unusual values, including low red blood cell count and blood proteins, albumin in particular. Stephanie also exhibited a high value for creatinine which indicated to her the breakdown and use of muscle tissue for energy. Dr. Pence felt that a person with the low amount of albumin present in Stephanie's blood would have been very lethargic and probably unable to walk in the hours before the blood sample was taken. She also agreed that it is possible in some circumstances that a child could lose well over half their body weight yet survive. She distinguished those cases from Stephanie's condition, citing the low blood protein levels and anemia.

In cross-examining Dr. Pence, the defense cited an article on Psychosocial Deprivation Dwarfism relied on by Dr. Pence. In that article, the doctor discussed several tests and background information required to diagnose that condition. While Dr. Pence conceded that the tests had not been performed, she also asserted that the tests could not be performed after death. She also rejected the defense's contentions that the blood tests were distorted by the IV solution.

Dr. David Hoblit performed the autopsy on Stephanie. His testimony began with a description of his background and training. Dr. Hoblit recounted that his residency included work in forensic pathology and that he worked as an associate medical examiner in Corpus Christi. He taught pathology at the University of California in the early 1970s and had an article published in 1974. Although Dr. Hoblit was board certified in clinical pathology but not forensic pathology, he estimated that he had performed some 800 autopsies, 400 of which were forensic autopsies.

12

He described his familiarity with research on deaths related to malnutrition, which were typically the result of improper efforts at weight reduction. He also stated that he participated in the autopsies of two women who died from misuse of diet pills. Dr. Hoblit helped design the laboratory monitoring portion of a weight reduction program operated in California.

Dr. Hoblit described the steps he took in conducting the autopsy of Stephanie Carman. He began by obtaining the records made in the emergency room. Before conducting the autopsy, Dr. Hoblit contacted Dr. Garcia, a pediatrician and director of a child abuse center, an ophthalmologist, and a photographer. He also requested x-rays of Stephanie's entire body. When he weighed her on a scale provided by the University Medial Center, Dr. Hoblit found that Stephanie weighted 43.8 pounds.[1] According to measurements made about 18 months prior to her death, her weight put her between the 50th and 75th percentiles. Based on continued growth at a normal rate, Hoblit estimated that Stephanie should have weighed between 58 and 66 pounds.

Dr. Hoblit found that Stephanie had only 0.5 centimeters of subcutaneous fat. He had never seen a person with a measurement of less than 1.2 centimeters. He also found 25 to 35 percent hair loss. According to the medical literature upon which he relied, hair loss begins four to six weeks after significant nutritional deprivation. Stephanie's hair also exhibited hypopigmentation (loss of pigment) which results from periods of severe protein deprivation.

---

[1]In response to defense challenges to the accuracy of the scale, the State called the Nursing Supervisor at University Medical Center, Nancy Smith. She provided the scale that Dr. Hoblit used to weigh Stephanie before the autopsy. Smith described how the scale is stored and calibrated before use. She was also present when Dr. Hoblit weighed Stephanie twice. She calibrated the scale between the first and second weighings and remembered that the scale indicated the same weight both times.

In examining x-rays of Stephanie, Dr. Hoblit found "growth arrest" lines in the long bones. Malnutrition is one of the causes of growth arrest. Dr. Hoblit described Stephanie's heart weight as 22 to 26 percent less than what it should have been. He stated flatly that that condition was life threatening and caused Stephanie's death. He also stated that her hemoglobin value of 4.5, less than half a normal value, could have independently caused her death. Malnutrition can also cause a reduction in hemoglobin. He found such a reduction in Stephanie's blood. Stephanie's serum protein was 2 grams when a normal value is between 6 and 8 grams, which the doctor also attributed to malnutrition. According to Dr. Hoblit, Stephanie's blood pH of 6.8 was significantly below the normal of 7.4 and was also a life threatening condition. He attributed the low pH value to the use of fat stores for energy. His tests revealed no drugs in Stephanie's body at the time of her death. He also stated that the IV fluids given would not have altered these findings.

Dr. Hoblit described Stephanie as exhibiting all ten symptoms listed in medical texts for Kwashiorkor. He also described two types of malnutrition: primary, where there is an inadequate diet; and secondary, where the malnutrition results from an inability to absorb or use nutrients. His examination of numerous internal organs convinced him that there was no possibility of secondary malnutrition. He described Stephanie's heart as "absolutely 100 percent diagnostic of [Kwashiorkor]." Examination of Stephanie's lungs did not show that aspiration of food particles was a cause of her death; however, he did find extensive loss of muscle in her diaphragm, which would have affected her ability to breath.

Dr. Hoblit also described the examination of Stephanie's stomach. He determined it was 40 to 50 percent full and specifically noted that it contained identifiable cubes of potatoes that showed no sign of having been chewed; however, it did not contain any pills. The stomach

14

contents he examined were not consistent with the list of Stephanie's meals that appellant gave the police. In response to a hypothetical question from the State, Dr. Hoblit opined that even if aspiration of food was the actual cause of Stephanie's death, her other conditions were extremely life threatening.

On cross-examination, the defense initially explored the relationship between Dr. Hoblit and Lubbock County. Beginning in May 1992, Dr. Hoblit negotiated with Lubbock County to hire forensic pathologists to perform autopsies for the County. On July 16, 1992, the County entered into a $200,000 per year contract with Dr. Hoblit's association. After having offers rejected by two candidates, he hired Dr. Jody Nielsen, who left for a job in Beaumont shortly after arriving. When asked why she left, Dr. Hoblit gave specific examples of problems. He recounted three incidents where Dr. Nielsen objected to his scheduling autopsies she was to perform, rather than directing requests for autopsies to her to schedule. She objected to law enforcement officers "looking over her shoulder" when performing autopsies. Dr. Hoblit also described her as being friends with Sergeant Bill Hubbard of the Lubbock Police Department. This friendship caused additional tension when Hubbard became the target of an investigation by the Lubbock County District Attorney.

The defense then re-examined the possible IV contamination of the blood samples. Dr. Hoblit stated that the amount of calcium in Stephanie's blood was high, contrary to what would be expected in a malnourished person; however, one of the IV solutions administered to Stephanie contained calcium. Because he characterized non-congenital thyroid disease before adolescence as "almost nonexistent," he examined the thyroid only generally and did not dissect it or prepare slides from it. Finally, he described malnourishment as a diagnosis of exclusion only to the degree that secondary malnutrition must be excluded to diagnose primary malnutrition.

15

The State's next witness was Dr. Ewell Clarke, a pediatric radiologist who teaches at the University of Texas at San Antonio. Dr. Clarke examined the x-rays of Stephanie taken after her death. He described two abnormal findings present in the x-rays. First, there was no detectable subcutaneous fat which is normally visible, although the muscles were within normal limits. Second, there were several growth arrest lines present in the bones of Stephanie's legs. These growth arrest lines indicate some severe stress such as cancer, a surgery, deprivation of food or inability to absorb food. He indicated that the causal stress occurred within the previous 9 to 12 months.

Although he acknowledged on cross-examination that he had seen hyperthyroidism in a seven year old, he was not asked whether those cases involved congenital conditions. He opined that he had never seen a case where growth arrest lines were the result of emotional disturbance, although he was aware of the possibility of such cases through his perusal of medical literature. Dr. Clarke estimated that he would expect to find growth arrest lines in about 10 percent of children.

The State then called Nina Stolzenberg, an intern in child psychology who saw Stephanie from August 1990 through July 1991. She described Stephanie at that time as thin, but not so thin as to cause concern. One of the tools Stolzenberg used to evaluate a new patient was to ask what they would wish for if they had three wishes. Stephanie's wish was for a fork, a knife and a spoon. Stolzenberg testified that Stephanie did very poorly on some standardized tests. The Carmans had expressed concern to Stolzenberg that Stephanie had been given strong alcohol and been undernourished when she was an infant and that may have impaired her development. Stolzenberg described the Carmans' participation as minimal, giving as an example their canceling

16

or failing to show up for at least 20 percent of the appointments that were made. The therapy ended at the request of appellant.

The State next called Dr. Robert Bux, a medical examiner from Bexar County certified in anatomical, clinical and forensic pathology. Dr. Bux examined the results of Stephanie's autopsy and gave his opinion as to her death. He began by noting several abnormalities in the blood tests, specifically high calcium, low sodium, and extremely low protein, hematocrit and hemoglobin. Dr. Bux dismissed the calcium and sodium values on the basis that the samples could have been affected by the IV solution or an error in the operation of the testing equipment. Because other values such as the enzyme levels were normal, he felt the blood samples were "valid."

Dr. Bux also noted the absence of subcutaneous fat in the x-rays and photographs taken at the autopsy and the growth arrest lines in the x-rays. The condition of the food found in Stephanie's stomach indicated to him that she had eaten just before she died. Because of the lack of inflammation in the lungs, Dr. Bux believed that any aspiration of food occurred essentially at the time of her death and was probably a result, rather than a cause, of her death. He also noted the loss of muscle in her diaphragm and the fibrosis in her heart, both of which are consistent with malnutrition. The autopsy information did not show any form of cancer or other medical problem that might have accounted for Stephanie's emaciated condition. Dr. Bux concluded that Stephanie suffered solely from starvation and malnutrition due to lack of food. This was so even though the autopsy showed several organs, including the spleen, thyroid, adrenal glands, and the endocrine system were normal.

In response to defense evidence suggesting the existence of other causes of Stephanie's condition, the State called Dr. Wilhelmina Tengco, a child psychiatrist who had treated Stephanie

17

in 1990. Based on her examination and treatment of Stephanie, Dr. Tengco determined that she did not suffer from an eating disorder, hyperthyroidism, leukemia or inability to absorb nutrients. However, on cross-examination she admitted that she did not perform any laboratory tests for any of these conditions. When queried, Dr. Tengco disagreed with the proposition that emotional problems affected physical growth.

The defense began its case in chief by calling Tommy Debs Crawford, another paramedic who responded to appellant's 911 call. He was the first emergency medical person at the scene and wrote the emergency medical service report on the event. When he first arrived, Steven Carman was attempting to clear Stephanie's mouth so she could breath. When Crawford began working on Stephanie she had no pulse and a "huge" amount of vomit in her mouth had to be cleared away. With the assistance of other paramedics, Crawford was able to force oxygen into Stephanie's lungs using a tube; however, the low level of oxygen subsequently found in Stephanie's blood indicated that the CPR was generally not effective.

Crawford's report described Stephanie as "unresponsive," meaning there was no reaction to any stimuli, including pain. It was his opinion that Stephanie had been in that condition for "awhile" before they were called. He described appellant as "tearful and distraught." When he questioned appellant about Stephanie's doctor, she replied that Stephanie did not have one. Crawford also confirmed the other paramedics' description of the room as very bare, with only a bunk bed and a chest.

The defense also presented the testimony of Irwin Okun, the Carmans' neighbor. Although he admitted having Alzheimer's disease, Okun remembered seeing Stephanie on two

18

specific occasions and that she seemed normal. Loretta visited the Okuns on several occasions but Stephanie and her parents did not.

Cora Colleen Riley Carman, who goes by "Carla," is married to Steven Carman's brother and has worked as a nurse's aid. She visited appellant's home at least once or twice a week, often accompanied by her children. Carla's family would often celebrate holidays at Steven and appellant's home. Many of these visits included having meals together. On those occasions Stephanie ate with the rest of the family. She directly contradicted the testimony of Shelly Carman, stating that appellant and Steven Carman never deprived Stephanie of food or kept her locked in her room. According to Carla, the only time Stephanie was required to stay in her room was to finish schoolwork. She also stated that Shelly had never been at appellant's home without Carla and also contradicted Shelly's description of Stephanie's exclusion from the Carmans' Christmas Day activities.

Carla testified that she had been in Stephanie's room on many occasions, including the week before her death, and that the room was always as it appeared in the photographs taken shortly after Stephanie's death. She described Stephanie as having a short attention span, developing slowly and more likely to have emotional outbursts than most children. As long as she had known Stephanie, she was "just a little, skinny, little kid" and had not suffered any noticeable weight loss.

On the day Stephanie died, Carla left work at 3:15 p.m. and went to appellant's house. Upon greeting her at the door, appellant told Carla that Stephanie would not eat and had not eaten all day. Although Stephanie would not talk to Carla, she did eat some pudding at Carla's request. After eating, Stephanie went to the sink and got a glass of water. Carla described Stephanie's

19

walk to the sink as skipping or hopping. After drinking the water, she returned to the table and "lowered herself down" to the floor and sat there.[2] Carla and appellant discussed taking Stephanie to a doctor because of Stephanie's failure to eat, and appellant told Carla that she would probably take Stephanie to a doctor after Steven got home. When Carla left the house at about 4 p.m., Stephanie was lying on the floor by her bedroom, but that did not strike her as unusual. Shortly after she arrived home, Steven Carman called to tell her that Stephanie had been taken to the hospital. Carla, her son, and her husband went to appellant's house and then to the hospital with Steven Carman. She described Steven as being in a "state of numbness."

Daniel Carman, Carla and Michael Carman's son and Stephanie's cousin, spent the last six weeks of the 1991-1992 school year at appellant and Steven Carman's home, returning to his own home a week before Stephanie's death. He testified that during his stay he ate with the Carmans and Stephanie always ate with the family. He also played with Stephanie in both the front and back yards of the house, although he did say she spent most of her time in her room. Daniel had been in Stephanie's room on many occasions and said that it always appeared as it did in the June 10 photographs. Daniel also contradicted Shelly's account of the previous Christmas, saying Stephanie was not excluded from the family's activities. On the day Stephanie died, Daniel was at the Carmans' house from early morning until his mother took him home at about 4 p.m. He saw Stephanie walking around the house earlier in the day and said she was acting normally at that time.

Daniel's sisters, Sybil and Paulette, echoed much of his testimony. They had also visited the Carmans' house on many occasions, often spending the night. Both stated that Stephanie

---

[2]Carla acknowledged that there was a slight discrepancy between her account and appellant's, which described Stephanie slumping out of a chair onto the floor.

20

regularly ate with the rest of the family. They remembered Stephanie's room being as it appeared in the June 10 photographs. The only time Sybil was aware that Stephanie was required to stay in her room was when she was "in trouble" with her parents. The sisters last saw Stephanie a week before her death and did not perceive that anything was wrong with her.

Stephanie's sister, Loretta, testified that she saw their natural mother put Everclear in Stephanie's bottle on many occasions. Loretta described the bottle and recalled reading the label. She also contradicted Shelly Carman's claim that Stephanie did not eat with the rest of the family. Loretta also disputed the State's evidence that Stephanie's room was barren. A videotape introduced through Loretta showed Stephanie participating in Christmas activities in 1990 and 1991; however, the tape purported to be the Christmas 1991 tape showed only members of the immediate family and did not show Loretta and Stephanie's cousins, or Carla and Michael Carman, as being present that day. In response to questions by the State, Loretta could not identify any photographs or videotapes made between Christmas 1991 and Stephanie's death the following June. Loretta also testified that on June 8, 1992, Stephanie looked and acted normally. When Steven came home from work that day, Steven asked Loretta to make coffee for him, walked toward the master bedroom, and saw Stephanie lying on the floor of her room. Steven then ran back to the kitchen and told appellant to call 911.

Describing her interview with Wayne Casey in New Mexico, Loretta denied that she had been told what to say and said Casey was the only person who pressured her to make particular statements.[3] She described previous occasions when Stephanie would refuse to eat for a few days

---

[3]In response, the State called Ann Garton, an employee of a New Mexico social service agency who was present during Loretta's interview with Detective Casey. She testified that Casey did not make any attempt to intimidate or pressure Loretta into giving particular answers to his questions.

and told Casey that on occasion Stephanie would eat too much. Loretta knew that there was a lock on Stephanie's door that was used to keep her from getting up at night and eating "a lot." Loretta then denied initialing the pages of her statement and suggested that Casey put them on the statement.

A family friend, JoAnn Jackson, testified that she and her family spent the Memorial Day weekend before Stephanie died with the Carmans. Jackson, who had raised nine children, described Stephanie's appearance as normal. The only difference she observed in Stephanie's appearance between Memorial Day 1992 and the previous visit in April 1991 was that Stephanie was taller; however, as the State pointed out, Stephanie had grown less than an inch in that period. Jackson described Stephanie's room as it appeared after her death. She also stated that Stephanie ate with the family and occasionally ate a large amount.

The defense medical expert was Dr. Jody Nielsen, a forensic pathologist working in Beaumont. Dr. Nielsen examined the autopsy report and much of the evidence on which it was based. She was of the opinion that the small abrasions pointed out by the State's experts actually occurred after death. She discounted the hair loss saying it was consistent with Stephanie pulling her hair out and that there was evidence of new hair growth. Dr. Nielsen was critical of Dr. Hoblit's failure to preserve a hair sample that illustrated the loss of pigmentation he found indicative of malnourishment, suggesting instead that the photographs of Stephanie's hair merely showed reflections of light. Concerning the exclusion of secondary malnutrition through an inability to absorb nutrients, Dr. Nielsen stated that the slides made of Stephanie's intestine no longer showed the structures needed to make that determination. She made a similar assertion

with regard to excluding the existence of leukemia, contending that a bone marrow sample was necessary.

Dr. Nielsen disagreed that there was fatty metamorphosis in Stephanie's liver. She found that the fat layer around the heart was normal for a child and that the heart weight was normal. She said these findings were inconsistent with malnutrition. She also suggested that Dr. Hoblit "doesn't know what a child's heart look[s] like normally" and even suggested that he was "manipulating the studies to say what he wanted it to say." She challenged the electrolyte results obtained from the blood samples on the basis that blood is not an accurate indicator after death and opined that testing the vitreous fluid was required. According to Dr. Nielsen, Stephanie's subcutaneous fat measurement of 0.5 centimeters was normal. In her opinion, none of the autopsy findings are pathonomic or diagnostic of malnutrition.

In Dr. Nielsen's opinion, hyperthyroidism could account for both increased activity level and metabolic rate resulting in weight loss. One of the hormones that would indicate hyperthyroidism, T4, could be tested after death, but this test was not performed on Stephanie. She also noted that no samples of the thymus, adrenal glands, or pancreas were taken, although each would show evidence of malnutrition. In her opinion, because of Stephanie's psychiatric problems and eating disorder, the growth charts described by Dr. Pence did not apply to Stephanie. Suggesting that Stephanie's death could have been the result of another disease, Dr. Nielsen pointed to a blood culture that indicated the presence of beta strep group b, an infectious organism that "has caused death . . . even in normal healthy people."

On cross-examination, the State elicited the fact that Dr. Nielsen had never performed an autopsy where malnutrition was determined to be the cause of death nor had she received training

23

in the field of nutrition. She also declined to estimate the number of autopsies she had performed on children. Dr. Nielsen admitted that she was not familiar with Stephanie's previous medical history, but she did not think knowledge of that history was significant in determining the cause of Stephanie's death. She also admitted she had not reviewed all of the autopsy results and, in particular, she had not examined the x-rays relied on by Drs. Clarke and Bux.

The defense called Steven Carman's mother, Lodina Kelly. She related that although he is large as an adult, he was very thin as a child. After Loretta and Stephanie went to live with appellant and Steven Carman, Lodina questioned Myrtis about putting Everclear in Stephanie's bottle and, according to Lodina, Myrtis did not deny it.

In her legal insufficiency argument and citing *Clark v. Procunier*, 755 F.2d 394 (5th Cir. 1985), appellant advances the proposition that if the evidence, viewed in the light most favorable to the prosecution, gives equal or nearly equal circumstantial support to guilt or innocence, then a jury must entertain a reasonable doubt. *Id*. at 396. This proposition has recently been reaffirmed by the Fifth Circuit in *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996); however, as we have stated above, in measuring the legal sufficiency of the evidence, both direct and circumstantial, we apply the *Jackson v. Virginia* test. *See Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991). Moreover, even assuming, arguendo, that the *Clark* test is applicable here, we believe the differences in the nature of the evidence presented in *Clark* and in this case are so significant as to make *Clark* inapplicable. In *Clark*, a business was burglarized and a safe containing motor vehicle inspection stickers was moved to a back door of the building. Apparently, part of the safe was outside the building. Some time later, stolen inspection stickers were found in Clark's wallet and his palm print was found on part of the safe. Thus, his conviction depended upon an inference, based on meager evidence, that he entered the building,

moved the safe, and stole its contents. The court held the evidence was no more supportive of that inference than of the inference that Clark only touched the safe after it had been moved to the door; thus, was not sufficient to support a burglary conviction.

In this case, the jury's findings were more dependent upon its resolution of the conflicting evidence before it than upon inferences drawn from relatively undisputed evidence. It is well established that determining the credibility of witnesses and the weight to be given their testimony is within the peculiar province of the factfinder. *McFarland v. State*, No. 71,557 (Tex.Crim.App. Feb. 21, 1996); *Billey v. State*, 895 S.W.2d 417, 419 (Tex.App.--Amarillo 1995, pet. ref'd). This deference to the factfinder goes so far as to permit consideration of testimony that an appellate court might find incredible. *Cacy v. State*, 901 S.W.2d 691, 703 (Tex.App.--El Paso 1995, no pet.). It is only when testimony is factually impossible that it must be ignored. *United States v. Casel*, 995 F.2d 1299, 1304 (5th Cir. 1993).

The jury in this case was presented highly contradictory evidence; however, appellant has failed to identify any testimony from the State's witnesses that was factually impossible or otherwise incredible. When viewed in the light most favorable to the prosecution, the evidence was sufficient to permit a rational factfinder to find that appellant intentionally or knowingly, by omission, caused serious bodily injury to Stephanie Carman; thus, it is legally sufficient to require submission to the jury for a guilt or innocence determination and the trial court acted properly in doing so. Appellant's first point of error is overruled.

Reiterated, consideration of appellant's challenge to the factual sufficiency of the evidence requires a review of all the evidence without viewing it in the light most favorable to the prosecution. If that review convinces us that the jury verdict is so contrary to the overwhelming

25

weight of the evidence as to be clearly wrong and unjust, we must remand the case for retrial before another jury. *Clewis*, *supra*, slip op. at 11.

We are instructed that in conducting such a review, we must not substitute our judgment for that of the jury. *Clewis,* slip op. at 12-14. Appellant argues that we "should review the evidence of Dr. Nielsen to determine whether the testimony is a *more plausible* explanation for Stephanie's death and/or serious bodily injury." (emphasis added). However, that of necessity involves a determination of the credibility of the witness and the weight to be given her testimony. This is precisely the type of review the *Clewis* court instructed us to avoid; indeed, it quoted with approval the Supreme Court's comment in *Pool v. Ford Motor Co.*, 715 S.W.2d at 634, that courts undertaking a factual sufficiency review "are not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable." *Clewis*, slip op. at 13-14. We are bound by that instruction.

It is only when an appellate court reverses a judgment based on factual sufficiency that it must detail the relevant evidence and explain why that evidence is factually insufficient. *Clewis*, slip op. at 14 (*citing Meraz v. State*, 785 S.W.2d 146, 154 n.2 (Tex.Crim.App. 1990); *Pool*, 715 S.W.2d at 635. Suffice it to say that we have carefully reviewed the evidence recounted above. The jury's resolution of the conflicts in that evidence was well within their province and was not against the overwhelming weight of the believable or credible evidence. Appellant's second point is overruled.

In her third point, citing and relying upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), appellant assigns error to the admission of Steven's written statement in violation of her sixth amendment right of confrontation. In response to that

proposition, the State argues that 1) appellant waived any complaint about the admission of Steven's statement, 2) Steven's statement was merely cumulative, and 3) a "*Bruton* error may not occur when both [defendants'] statements are entered."

In *Bruton*, the United States Supreme Court held that the admission of a non-testifying co-defendant's statements incriminating the defendant violates the defendant's sixth amendment right of confrontation. 391 U.S. at 126. *See also Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Based on its holding in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that an instruction to the jury to disregard a defendant's confession if it found the confession to have been given involuntarily was insufficient to safeguard the defendant's due process rights, the *Bruton* Court reasoned that an instruction limiting the purposes for which a jury could consider a non-testifying co-defendant's statements afforded no greater protection. *Bruton*, 391 U.S. at 135. This holding was soon applied by the Court of Criminal Appeals to invalidate a prior rule allowing statements of a principal to be used in the prosecution of an accomplice. *Schepps v. State*, 432 S.W.2d 926, 943 (Tex.Crim.App. 1968) (op. on reh'g).

The relationship between co-defendants' statements was further explicated in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). In that case, the Court overruled previous authority to the contrary and held that admission of a non-testifying co-defendant's incriminating statement was error regardless of a limiting instruction *or* the admissibility of a corroborating statement made by the defendant. 481 U.S. at 193-94. Consequently, the State's third argument challenging this point is without merit; however, the *Cruz* Court did acknowledge the possibility that the defendant's statements could render admission of a co-defendant's incriminating statements harmless. 481 U.S. at 194.

27

As we note, the State also argues that appellant waived any error that might have occurred when Steven's statement was admitted by failing to object to its admission. The record shows that when the officer who took the defendant's statements began to testify concerning the statements, the following colloquy occurred:

The Court: Is there anything we need to take up before we have the jury back in?

Defense: Yes, Your Honor.

Court: All right.

Defense: There are certain matters contained in each statement of Steve Carman that we feel like should be redacted. There is the original, and here is [sic] some of the things that we're pointing out to the court.

Court: All of the highlighted portions?

Defense: Well -- And let me point out to you, Judge, that this sentence right here probably needs to be -- the entire thing needs to be redacted, because if you redact one word, it's going to be pretty obvious. You know, they can fill in the blank type thing is what I'm saying. So, I think those entire sentences need to be taken out.[4]

Court: All right. Have you all seen this [proposed redacted statement]?

Prosecutor 1: No, your Honor.

\*   \*   \*

Prosecutor 2: The second page, we don't have any problem at this point with "when we lived in New Mexico," [being taken out] but we do have a problem with "I had a concern about Pat using food as an incentive with Steph." That goes to the heart of our proof, our issue here.

Court: Well, it's pretty clear what time frame he's talking about, though. I mean, when we lived in New Mexico is the time frame.

---

[4]At issue were two portions of Stephen's statement concerning appellant's fear of "Social Services becoming involved again." Appellant sought to exclude the entire sentence rather than just the word "again."

28

Defense:  Judge, this problem comes up a lot in federal court, and it's called the *Bruton* problem.  And what happens is if Steve Carman didn't testify, and you all let that in, then I get to comment on his failure to testify to impeach this.  And then, we've got two mistrials is why it should be redacted in my opinion.

The trial court removed the entire sentence about Steven's concerns when the family lived in New Mexico.  It also removed two occurrences of the word "again" as described in the objection quoted below, but declined to remove all of the sentences.  When the State sought to introduce Steven's statement, appellant made the following objection:

Defense:  All right. Your Honor, if I need to state my objection again, I'm looking at page two on Stephen [sic] Carman's statement, wherein it says, "I remember Pat saying that she was concerned about taking Stephanie to the doctor because she thought Social Service would get involved," and then there's a blank. I object to that statement as a 404(b) matter, that it shows or attempts to show an act of misconduct. It's an attempt to show unfair prejudice, other than the charge we have.

Then I object, "I think it was Tuesday of last week that Pat told me she was force feeding Stephanie because she didn't want Social Services becoming involved." There is no period after it.  There's just a blank. So, once again, there will be no doubt what this jury will interpret from reading this.  And we submit its 404(b) matters that are -- that the Court has previously ruled are not admissible, and that therefore, Pat Carman's right to due process under the United States Constitution, Fifth and Fourteenth amendments, Article I, Section 19 of the Texas Constitution, Article 1.04 of the Texas Code of Criminal Procedure will be violated by allowing this in.  I also object that it violates Bruton versus U.S. And that in final argument, there could be a requirement that I point out if Mr. Carman does not testify.

Court:  All right.  The objections are overruled.

Prosecutor 1:  Very quickly before the jury comes back in, it's my intent - -

Defense:  Your Honor, I also just ask that there be a period put after those sentences.

Court:  Fine. I don't have any problem with that, and I'll just put a period.      * * *

29

In support of its position, the State makes several arguments: 1) that the objections were only to the cited portions of Steven's statement rather than to the statement as a whole, 2) she failed to make a pretrial motion to suppress the statement, 3) she failed to seek a severance, 4) she failed to request a limiting instruction.

In order to preserve error for appellate review, a party must make a timely request, objection or motion stating the specific grounds for the ruling he desires the court to make if the specific grounds are not apparent from the record. Tex. R. App. P. 52(a). The purpose of this rule is to allow the trial court to make a determination and ruling and then proceed with the trial under the proper procedural and substantive manners, as appropriately corrected by the trial court. *Janecka v. State*, 823 S.W.2d 232, 243-44 (Tex.Crim.App. 1990) (op. on reh' g). Requiring that an objection be made at a time when there is an opportunity to respond and cure any error is dictated by considerations of fairness and judicial economy. *Young v. State*, 826 S.W.2d 141, 149 (Tex.Crim.App. 1991). Those are the justifications for the rule that in instances where a defendant's objection at trial does not comport with her complaint on appeal, nothing is preserved for review. *Cravens v. State*, 687 S.W.2d 748, 752 (Tex.Crim.App. 1985).

It is apparent that appellant's complaint on appeal is based directly on the Supreme Court's holding in *Bruton*. Although appellant specifically cited *Bruton* in making her objection, it appears clear to us from the objections quoted above and the way in which appellant referred to *Bruton*, that the objection was to specific portions of Steven's statement, not the entire statement.

In the initial objection, appellant referred to *Bruton* as support for "why it should be redacted," not why the statement should be "excluded." Appellant's second objection that "*it* violates *Bruton*" is ambiguous when taken by itself; however, when read in conjunction with the

rest of the objection identifying specific portions of the statement she found incriminating, the pronoun *it* appears to refer to those specific parts of the statement rather than the statement as a whole. That being so, appellant's trial objection was not sufficiently definite to preserve her complaint that the trial court erred in admitting Steven's statement as it was admitted. Appellant's third point is overruled.

In her fourth point, appellant contends the trial court erred in overruling her motion for new trial based upon alleged juror misconduct. The facts upon which appellant bases this point involved juror Robert York and the State's witness Lloyd Cody. During voir dire, the jury panel was asked to complete a questionnaire. One of the questions asked if the panel member knew any of the potential witnesses on a one-page list. Lloyd Cody was the eighteenth of 98 names. When questioned individually, York stated that he did not know anyone on the list. At the close of voir dire, appellant renewed several challenges for cause which were denied. After using peremptory challenges to remove several panel members, appellant sought additional peremptory challenges to remove, *inter alia*, York. This request was also denied.

After Lloyd Cody testified, York notified the trial court that he knew Lloyd Cody. This resulted in a hearing on the matter. At that hearing, York described his relationship with Cody as limited to "casual contact" at church activities. Based on York's answers at that hearing, the parties made no objection to his continued participation as a juror.

In appellant's post-trial motion for new trial, she urged juror misconduct. The trial court held another hearing at which appellant presented additional evidence of York's relationship with Cody. Cody testified that his wife was York's cousin.[5] Although some years earlier they had

---

[5]Robert York's grandmother was the sister of Lloyd Cody's father-in-law.

attended family gatherings together, he said their recent relationship was primarily through church activities and they had not visited each other's homes. He and York were first acquainted through the church well before they became related. On one occasion when Cody was seventeen and York was about seven, their families had taken a vacation together. Juror York testified at the hearing that he had not seen Lloyd Cody's name on the witness list when he completed the questionnaire. Although he remembered the vacation with Cody's family, York claimed he was about 4 and did not remember Lloyd Cody being present. According to York, they had not attended a family gathering together for approximately 10 years. He averred their recent relationship had been limited to "casual" contact at church events.

It is the rule that when a juror withholds material information during voir dire, the juror denies the parties an opportunity to intelligently exercise their challenges and obtain an impartial jury. *Jones v. State*, 596 S.W.2d 134, 136 (Tex.Crim.App. 1980). Several decisions of the Court of Criminal Appeals hold that information is not "withheld" unless the juror is "ask[ed] questions calculated to bring out that information which might be said to indicate a juror's inability to be impartial and truthful." *Armstrong v. State*, 897 S.W.2d 361, 363-64 (Tex.Crim.App. 1995).

Initially, we disagree with the State's argument that defense counsel did not ask properly focused questions concerning this matter. The question on voir dire was simple and direct: "Do you know anyone on the one-page witness list?" When juror York became aware that he did know one of the witnesses, his negative answer to the question amounted to the withholding of evidence and required the court hearings to determine the effect of that error. Whether intentional or not, York withheld information.

32

We initially note the language in *Von January v. State*, 576 S.W.2d 43, 45 (Tex. Crim. App. 1978), that the significance of a juror's relationship with other participants in a trial is for defense counsel and not the juror to determine and, in order to make that determination, counsel is entitled to know the facts concerning that relationship. In *Von January*, a murder case, the foreman of the jury failed to reveal a close and long acquaintance with the family of the victim, and even though the juror recognized the victim's grandfather when he entered the court room, failed to respond to defense counsel's question whether any of the juror's knew members of the victim's family. The juror admitted he may have erred in not answering the question, but rationalized his failure to answer by saying that although he knew and recognized the victim's family, he did not answer "because he did not have any close personal dealings with the family." *Id*. at 45. Based on these facts, the appellate court determined reversible error was shown. In doing so, the court placed emphasis on the fact that the juror's acquaintance was with the family of the victim and, additionally, that the juror served as foreman of the trial jury, "a position of influence."

In reaching its conclusion, the *Von January* court contrasted the facts before it with those before the court in *Babin v State*, 149 Tex. Crim. 339, 194 S.W.2d 563 (1946). In *Babin*, which also involved the foreman of the trial jury, the juror also failed to disclose the degree of his relationship with the victim. Although he had said that he "only knew him when he saw him [the deceased]," he failed to mention that he and the deceased were neighbors in a very small town. *Id*. at 566. The appellate court concluded the jury foreman's answer on voir dire "was not so palpably misleading or intentionally deceptive as to require reversal." *Von January*, 576 S.W.2d at 45.

The facts before us are more nearly akin to those in *Babin* than those in *Von January*. Here, the juror's relationship was with a minor witness, virtually all of whose testimony was echoed by other witnesses. Additionally, the variance between the nature of the juror's relationship and what was not revealed was minimal. The trial court did not abuse its discretion in refusing to grant the motion for new trial. Appellant's fourth point is overruled.

In her fifth point, appellant assigns error to the admission of testimony concerning her reputation for being law abiding while living in Moriarity, New Mexico, approximately three years before Stephanie's death. In support of this point appellant initially cites *Smith v. State*, 162 Tex. Crim. 237, 283 S.W.2d 936, 938-39 (1955), which defines general reputation as "what is generally said about him in the community in which he lives . . . ." Appellant acknowledges but seeks to distinguish *Arocha v. State*, 495 S.W.2d 957, 958 (Tex.Crim.App. 1973), which held "[a] person's community is not limited to the locale where the case is tried nor his residence at the date the offense was committed." Appellant's attempt to distinguish *Arocha* is unavailing.

In *Arocha*, the defendant was being prosecuted in Austin for the sale of marijuana. The witness was asked if he had heard that Arocha was charged with possession of marijuana in Houston. The appellant argued the question was improper because it did not inquire as to his reputation "in the community" and Houston could not be consider "in the community" of Austin. In overruling that contention, the court commented, "[A] person's community is not limited to the locale where the case is tried nor his residence at the date the offense was committed." *Arocha*, 495 S.W.2d at 958.

Although *Arocha* supports the trial court's decision here, article 37.07, § 3(a) of the Code of Criminal Procedure is dispositive of this point. This statute governs the types of evidence admissible at the punishment phase of trial. In relevant part, it provides:

> evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . his general reputation, his character, [and] an opinion regarding his character . . . .

Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a) (Vernon Supp. 1996).

Nothing in the foregoing statute limits evidence of a defendant's general reputation to a particular community. *See also Tompkins v. State*, 774 S.W.2d 195, 216-17 (Tex.Crim.App. 1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (holding defendant's reputation in Virginia admissible in Texas prosecution). Appellant's fifth point is overruled.

In his sixth point, appellant contests the trial court's refusal to submit a jury instruction on the offense of endangering a child. It is well established that upon timely request, a defendant is entitled to an instruction on a lesser-included offense if two conditions are met. First, the lesser offense must be within the proof necessary to establish the offense charged. Second, the record must contain some evidence that would permit a jury rationally to find that if the defendant is guilty, she is guilty of only the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App. 1993), *cert. denied*, __ U.S. __, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993).

Examination of the elements of the Penal Code offenses of injury to a child (§ 22.04(a)) and endangering a child (§ 22.041(c)) suggests that endangering a child is a lesser-included offense of the second and third methods by which one may commit injury to a child (causing serious mental deficiency, impairment or injury or by causing bodily injury), but not of the first

35

method (causing serious bodily injury). The most significant distinction between the two offenses is that endangering a child does not require an actual injury. Here, appellant was indicted for causing serious bodily injury and serious mental deficiency and impairment. The jury charge contained instructions on all three methods of committing injury to a child.

Having determined that endangering a child can be a lesser included offense of injury to a child, we must next determine whether there was some evidence that would have permitted a jury to rationally find that if appellant was guilty, she was guilty only of the lesser offense. In order to make such a finding, the jury would have to find that appellant failed to provide Stephanie with proper nutrition, but neither her bodily injury nor her death were the result of that malnutrition.

The only evidence that Stephanie's injury or death might have been caused by something other than malnutrition came from Dr. Nielsen, who also testified that Stephanie was *not* suffering from malnutrition. Consequently, the jury would have to disbelieve the State's experts who said Stephanie was malnourished, disbelieve the State's experts on the issue of causation, and believe Dr. Nielsen's speculative theory of causation while rejecting her testimony concerning malnutrition. Given the nature of the evidence, which we have recited in rather exhaustive detail, we do not agree that the jury could rationally engage in such mental gymnastics. We overrule appellant's sixth point.

In her seventh point, appellant assigns error to the admission of the testimony of one of the State's expert witnesses, Dr. Pence. Appellant characterizes the testimony as presenting novel theories and opinion although she "lacked the expertise to make them admissible." The admission

of expert testimony is governed by Rule 702 of the Texas Rules of Criminal Evidence. That rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The decision of whether to permit the testimony of an expert witness is within the discretion of the trial court, *Duckett v. State*, 797 S.W.2d 906, 910 (Tex.Crim.App. 1990), and will not be overturned absent an abuse of that discretion. *Amos v. State*, 819 S.W.2d 156, 163 (Tex.Crim.App. 1991), *cert. denied*, 504 U.S. 917, 112 S.Ct. 1959, 118 L.Ed.2d 561 (1992). The primary consideration is whether the expert's specialized knowledge will assist the trier of fact. *Pierce v. State*, 777 S.W.2d 399, 414 (Tex.Crim.App. 1989), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). Rule 702 is not satisfied when the witness's knowledge or expertise is unlikely to exceed the common knowledge or reasoning of the jurors. *Id*; *Alba v. State*, 905 S.W.2d 581, 592 (Tex.Crim.App. 1995).

Careful examination of appellant's argument in support of this point fails to reveal any reference to testimony presenting the "novel theories" she seeks to challenge. There are, however, specific references to testimony that appellant argues was beyond the expertise of Dr. Pence.

As recited above, Dr. Pence held a Ph.D. and was an associate professor of pathology who studies and teaches nutrition. Appellant complains that Dr. Pence's statements that children who are not fed properly often have behavioral problems because they are constantly hungry, were improperly admitted because she was not a psychologist or medical doctor. We cannot agree. Logic would support the testimony of Dr. Pence that those engaged in the study of nutrition and the effects of malnutrition also study the effects of nutrition on behavior. Admission of this testimony was proper.

Appellant also complains of Dr. Pence's testimony that overfeeding a severely malnourished person can cause heart failure. Appellant asserts that admission of this testimony was improper because Dr. Pence was not a medical doctor or cardiologist. In response to defense questions on voir dire, Dr. Pence testified that the issue of heart failure was one of the topics she teaches to medical students. We are unprepared to hold that a person qualified to teach a topic to medical students is not qualified to give expert testimony on that same topic. Appellant's seventh point is overruled.

In her eighth and final point, appellant challenges the trial court's refusal to submit a requested instruction to the effect that if the jury found that appellant's culpable mental state was merely criminal negligence, they must acquit. Since the indictment only alleged an offense by omission, an examination of the text of Section 22.04(a) shows this is indisputably an accurate statement of the law:

> A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . serious bodily injury.

Tex. Penal Code § 22.04(a) (Vernon 1994).

However, it is established law that an instruction that merely denies an element of the offense need not be given. *Moore v. State*, 736 S.W.2d 682 (Tex.Crim.App. 1987). Because the State was required to prove that appellant acted intentionally, knowingly, or recklessly, the requested instruction that criminal negligence was insufficient simply sought to negate an element of the offense.

Appellant cites *Troyer v. State*, 516 S.W.2d 163, 164 (Tex.Crim.App. 1974), for the proposition that the failure to give a defensive charge on the issue of culpability is reversible error. In *Troyer*, the trial court failed to give *any* instruction on culpability in spite of a specific request. Here, however, the court's charge included instructions on intentionally, knowingly and recklessly, making *Troyer* inapplicable. *See Manuel v. State*, 782 S.W.2d 335, 337 (Tex.App.--Houston [1st Dist.] 1989, pet. ref'd). Appellant's eighth point is overruled.

In summary, all of appellant's points are overruled and, finding no reversible error in the proceeding below, we affirm appellant's conviction.


John T. Boyd
Justice

Do not publish.