**Tommy Joe BILLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–93–0468–CR.**

Court of Appeals of Texas, Amarillo.

Jan. 30, 1995.

Discretionary Review Refused May 10, 1995.

W. Clay Abbott, Lubbock, for appellant.

Travis Ware, Dist. Atty., Michael West, Asst. Dist. Atty., Lubbock, for appellee.

Before DODSON, BOYD and POFF, JJ.

BOYD, Justice.

In two points of error, appellant Tommy Joe Billey challenges his conviction of the offense of aggravated robbery, a first degree felony. His punishment, enhanced by two prior felony convictions, was assessed by the trial jury at sixty (60) years confinement in the Texas Department of Criminal Justice, Institutional Division. In his two points, appellant contends the trial court erred in failing to: (1) direct a verdict of not guilty as the evidence was insufficient to sustain a conviction; and (2) suppress evidence obtained in violation of the Fourth Amendment to the United States Constitution. For reasons explained below, we affirm the judgment of the trial court.

On October 2, 1993, appellant entered a small grocery store in Lubbock, Texas owned by Susan George, approached the counter and demanded that George place all of the money from the cash register into a plastic bag. Appellant then pulled up his shirt and displayed a sheathed hunting knife that he was carrying in the front of his pants. George complied with appellant's demands and appellant left the store with approximately $300.

Two days later, while evading police detention, appellant allegedly took an overdose of drugs. While appellant was being observed at University Medical Center in Lubbock, the police questioned him regarding the robbery of the grocery store. After receiving his *Miranda* rights,[1] appellant signed a form consenting to a search of his motel room, where police seized a knife found under a mattress of one of the beds. The knife was introduced as demonstrative evidence during appellant's trial for the offense of aggravated robbery. Additional facts will be discussed as may be necessary in addressing appellant's points of error.

■ In his first point, appellant asserts the trial court erred in denying his motion for a directed verdict of not guilty because the State's evidence was insufficient to prove the use and exhibition of a deadly weapon, to-wit, a knife, as charged in the indictment. An appellate challenge to a trial court's ruling on a directed verdict motion is actually a challenge to the sufficiency of the evidence to support the judgment of conviction. *Cook v. State*, 858 S.W.2d 467, 470 (Tex.Crim.App. 1993); *Ex parte Kunkle*, 852 S.W.2d 499, 504 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 122, 126 L.Ed.2d 87 (1993). In determining whether the evidence is sufficient to support a conviction for the offense charged, an appellate court is not to ascertain whether it believes the evidence establishes guilt beyond a reasonable doubt, *Stoker v. State*, 788 S.W.2d 1, 6 (Tex.Crim.App. 1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); rather, the applicable standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See Geesa v. State*, 820 S.W.2d 154, 160–61 (Tex. Crim.App.1991). In reviewing all of the evidence, as we must, to test its sufficiency, our focus is not on what the State's evidence failed to show; instead, our focus is on the evidence actually introduced. *Chambers v. State*, 711 S.W.2d 240, 245 (Tex.Crim.App. 1986). Additionally, as a reviewing court, we may not resolve any conflict of fact, weigh the evidence or assign credibility to the witnesses as such functions are solely in the province of the jury. *Juarez v. State*, 796 S.W.2d 523, 524 (Tex.App.—San Antonio 1990, pet. ref'd). After applying these standards, if we find that the State introduced some evidence to support each element of the offense, we must hold that the denial of the directed verdict was proper because such

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

evidence raised factual issues for the jury to determine. *Bustillos v. State*, 832 S.W.2d 668, 676 (Tex.App.—El Paso 1992, pet. ref'd); *Harris v. State*, 790 S.W.2d 778, 779 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd); *Ellis v. State*, 714 S.W.2d 465, 471 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd).

In the first count of the indictment upon which the State proceeded to trial, the State alleged that appellant:

> [I]ntentionally, while in the course of committing theft of property and with intent to obtain and maintain control of said property, threaten and place SUSAN GEORGE in fear of imminent bodily injury, and the defendant did then and there use and exhibit a deadly weapon, to-wit: a knife, that in the manner of its use and intended use was capable of causing death and serious bodily injury.

The trial court's charge to the jury tracked the language of the indictment. To prove the aggravation of the robbery, this indictment and the corresponding charge required the State to prove, initially, that the knife involved in the robbery was a deadly weapon, and secondly, that the knife was used and exhibited during the robbery. In his argument under this first point, appellant challenges only the sufficiency of the State's evidence to establish that the knife was a deadly weapon.

■ Appellant initially argues that as the knife used in the robbery was not identified and introduced into evidence, it is impossible to determine whether the actual knife was capable of being a deadly weapon. Appellant fails to recognize, however, that the actual knife used in the commission of an offense need not be introduced into evidence if a witness is able to testify about the knife and the manner in which it was used. *See Morales v. State*, 633 S.W.2d 866, 868 (Tex.Crim. App. [Panel Op.] 1982); *Odom v. State*, 852 S.W.2d 685, .687 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd); *Aleman v. State*, 795 S.W.2d 332, 335 (Tex.App.—Amarillo 1990, no pet.).

Here, George and her oldest daughter, Heather, testified regarding the knife and the manner in which appellant used it. Moreover, a knife which George identified as being similar to the one used during the robbery was introduced into evidence for illustrative purposes. Detective Van Roy Pierce with the City of Lubbock Police Department testified that a knife of that type could cause death or serious bodily injury. Thus, we find appellant's initial contention to be without merit. Having done so, we must next determine whether the evidence was sufficient to establish that the actual knife used in the robbery was a deadly weapon.

■ When an indictment alleges that an appellant "used or exhibited a deadly weapon, to-wit: a knife," the evidence must first establish that the knife was, in fact, "deadly." *Lockett v. State*, 874 S.W.2d 810, 814 (Tex. App.—Dallas 1994, no pet.); *Jones v. State*, 843 S.W.2d 92, 96 (Tex.App.—Dallas 1992, pet. ref'd). Texas defines a deadly weapon as:

> (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or
>
> (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

Tex. Penal Code Ann. § 1.07(a)(17) (Vernon 1994). It is the general rule that a knife is not a deadly weapon *per se. Lewis v. State*, 628 S.W.2d 276, 278 (Tex.App.—Amarillo 1982, no pet.). However, some varieties of knives may qualify as deadly weapons under the first provision of the definition because they are designed for the purpose of inflicting serious bodily injury or death. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex.Crim.App. 1991) (bayonets, scimitars and swords of various kinds can be deadly weapons under section 1.07(a)(11)(A), which is the progenitor of the present section 1.07(a)(17)).

■ Even so, most knives can only qualify as deadly weapons under the second provision. Qualification may be established by showing, among other things, the manner of the knife's use or intended use, its size and shape, and its capacity to produce death or serious bodily injury. *Davidson v. State*, 602 S.W.2d 272, 273 (Tex.Crim.App.1980). Each case must be examined on its own facts to determine whether the fact finder could have

concluded from the surrounding circumstances that the knife was used or was to be used as a deadly weapon. *Brown v. State,* 716 S.W.2d 939, 947 (Tex.Crim.App.1986). Factors that may be considered are an accused's express and implied threats, the distance between the accused and the victim, and the victim's description of the knife in determining whether it was intended to be used as a deadly weapon. *Id.* at 946. A person need not be wounded for a knife to be used as a deadly weapon. *Denham v. State,* 574 S.W.2d 129, 130 (Tex.Crim.App.1978).

A proper discussion of this question requires a detailed review of the testimony elicited during the guilt/innocence phase of the trial. The record reveals that George testified that on October 2, 1993, she was working as the cashier at her convenience store. Her two children, Tiffany age nine, and Heather age eleven, were behind the checkout counter with her watching a football game on a portable television set.

Around noontime, appellant came into the store to get change for the pay phone located outside the front of the store. Approximately thirty to forty minutes later, he came into the store a second time and spoke with George concerning the football game. When appellant entered the store a third time, he went straight to the counter, laid a plastic bag on the counter and demanded, in a low voice,[2] that George place the money from the cash register into the bag.

In disbelief, George asked appellant "if he was kidding," to which appellant responded by pulling up his shirt and displaying a silver and black hunting knife in a black sheath. Looking directly at George, appellant placed his hand on the handle of the knife, pulled it out to show approximately three quarters of an inch of the blade, and stated, in a louder voice, that he "wasn't kidding." Appellant again demanded that George give him the money in the cash register. Realizing that appellant was "very serious," George quickly opened the register and attempted to retrieve the cash money from the register drawer, fumbling the money in the process.

Believing her slowness to be a result of her counting the money as she removed it from the drawer, appellant ordered George not to count the money. George responded that she was not counting, that she was simply scared. Appellant, stating that he was scared as well, reached over the counter and began grabbing the money from the register. George stepped back from the counter to protect her children, who were only three to four feet behind her. When appellant finished loading the bag with the money, he told George to take her children to the back of the store and then he ran out through the front door.

George averred the handle of the hunting knife was about five or six inches long and, even though appellant did not pull the knife all of the way out to where she could see the entire blade, she was generally aware of the size and injurious capability because she was familiar with knives of that type. She definitively stated that it was the kind of knife that could cause serious bodily injury or death and that she was afraid of the knife and scared that appellant would hurt her or the children. George posited that no one would go into a store wielding such a knife "if he wasn't planning on hurting" someone.

On cross-examination, George testified that the knife found in appellant's motel room looked like the one used during the robbery but admitted that she did not know if it was the actual one involved. Although she conceded that appellant only pulled the knife out of the sheath in his pants "just enough to see the blade," she commented that appellant made sure she saw and knew what it was. She also admitted that appellant did not scream at her or make any express verbal threats to her concerning the knife. She also acknowledged that appellant did not touch her during the robbery although she was "within arm's reach" from him while at the counter and no more than three to four feet after she stepped back toward the children.

---

2. In the police report, George stated that she believed appellant was keeping his voice down so that the children would not know that their mother was being robbed and they would stay quiet.

Heather also testified that she saw appellant pull a knife from his belt during the robbery. She said appellant pulled the knife out "just a little bit" so that she saw less than an inch of the knife's blade; however, she was able to describe the knife as having a black handle and a silver blade. Heather testified that she was very scared when she saw her mother being robbed and when her younger sister started crying and appellant told her to be quiet.

Pierce testified concerning the knife found in the police search of appellant's motel room. According to him, the knife was a large hunting knife, probably eight to ten inches long in overall length, a black handle, a fixed blade, and in a black leather sheath. In his expert opinion, Pierce posited that the type of knife found in appellant's room could "easily" cause death or serious bodily injury.

On cross-examination, Pierce reaffirmed that he believed the knife could be used as a deadly weapon. When queried if the knife were presented with only a small portion of the blade exposed did he still believe the knife was a deadly weapon, the officer replied in the affirmative. When asked if his answer would be different if he had never seen the knife in its entirety, Pierce stated that in the way the prosecutor held it, he still believed that the knife could be used as a deadly weapon, even if the handle were turned around and it were used to "knock[ ] someone on the head with it." He explained that the knife would still be a weapon and he would immediately think it was a deadly weapon even if only seeing a part of the blade. The officer also admitted that a sheath could conceal the absence of a blade on a knife or even a very dull one.

There is a paucity of cases discussing the deadliness of a knife exhibited to facilitate the commission of a felony offense where the knife is not aggressively brandished, *i.e.*, where the knife has not been used to wound the victim, held against the victim's neck, or waved in the victim's face. Nevertheless, it is the rule that the knife need not actually be "used" in a manner capable of causing death or serious bodily injury in order to support a finding that it is a deadly weapon. Instead, the evidence need only prove that the man-

ner of the knife's *intended use* be capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(17) (Vernon 1994).

To this end, evidence is sufficient if a knife is capable of causing death or serious bodily injury or if it is displayed in a manner conveying an express or implied threat that serious bodily injury or death will be inflicted if the desire of the person displaying the knife is not satisfied. *Jones,* 843 S.W.2d at 96. Where the victim testifies that he or she was in fear of serious bodily injury or death, a verbal threat by the accused is not required for the fact finder to conclude that threats were actually made. *Tisdale v. State,* 686 S.W.2d 110, 115 (Tex.Crim.App. 1984); *Soto v. State,* 864 S.W.2d 687, 692 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd).

In the instant case, direct evidence established that appellant exposed his concealed knife to George in response to her question of whether he was "kidding" in regard to his demand for money. He additionally placed his hand on the large handle and partially withdrew the knife from his scabbard revealing a shiny, silver blade. These gestures carried an implied, if not an express, threat that if George did not give appellant the money in the register that he *would* use the knife to inflict serious bodily injury or death upon her or her children. Appellant was clearly in close enough proximity to use the knife on George if she refused to do as he demanded.

From all of the circumstances, a rational trier of fact could find appellant *intended* to use his knife in a manner capable of causing death or serious bodily injury if his plans were to go awry. There is no other logical intended purpose for such a knife displayed in order to facilitate a commission of a robbery or other offense.

Whether or not appellant would have carried out his threatened use of the knife is not relevant to the question of whether he intended to use the knife as a deadly weapon. By producing the knife and exhibiting its blade, even if only in part, appellant

achieved his desired effect of placing George in fear of death or serious bodily injury.

Based on the portion of the knife she saw, George could reasonably estimate the actual length and shape of the blade of the knife and its capacity to inflict death or serious bodily injury. To say that a victim must be provided with a clear, unobstructed, and complete view of the weapon used in the commission of a crime in order to establish the deadliness of the weapon is to reward the wary criminal who, knowing that overt actions will draw attention, will conceal his weapon, except for a brief viewing by the victim, for fear that others may attempt to thwart his efforts upon discovering that a crime is being committed. Regardless of whether a total and detailed inspection of the weapon is permitted, the victim is inflicted with the same degree of fear that he or she will be harmed by the weapon. Additionally, the fact remains that the crime is furthered because of the attacker's exhibition of the weapon.

Nor is it necessary that an attacker actively engage a victim with his weapon. Although an act of aggression is a factor that may be considered in determining whether a weapon is a deadly one, in many cases such an act is not necessary to determine the attacker's intent that the weapon be capable of inflicting serious bodily injury or death if his wishes are not met. By displaying his weapon, even a portion of the weapon, without taking further steps to draw attention to himself and the crime in progress, an attacker has shown that the manner in which he intends to use the weapon is capable of causing death or serious bodily injury.

The evidence in this case is amply sufficient to support the jury's evident conclusion that, in the course of committing theft, appellant's exhibition of the knife to George was sufficient to place her in fear of imminent bodily injury and that in the manner of its use and intended use, the knife was capable of causing her serious bodily injury or death if his demands were not satisfied. Accordingly, the trial court did not err in refusing appellant's motion for directed verdict and his first point of error is overruled.

In his second point, appellant asserts the trial court erred in denying his motion to suppress evidence obtained as a result of a search of his motel room. The thrust of this challenge is that inasmuch as his consent to the search was not voluntary, it violated the Fourth Amendment to the United States Constitution and any evidence obtained as a result thereof was inadmissible.

The State initially argues that appellant has waived this point of error by failing to support his argument with authority distinguishing state and federal constitutional provisions regarding search and seizure. It is the rule that if an appellant asserts several constitutional grounds for reversal, he or she should separate federal and state issues and provide substantive argument or analysis on each separate ground and if the appellant fails to do so, the point of error is multifarious and may be overruled. *Heitman v. State*, 815 S.W.2d 681, 690–91 n. 23 (Tex. Crim.App.1991).

That rule, however, is not applicable in this appeal inasmuch as appellant only raises federal constitutional questions. That being true, appellant's point of error is not multifarious under the *Heitman* doctrine and we must address appellant's second point challenge.

It is the well established rule that in a pretrial suppression hearing, the trial court is the sole trier of fact and, as such, it is within that court's exclusive province to resolve conflicts in the testimony, if they exist, and to determine the credibility of the witnesses and the weight to be given their testimony. Because of the trial court's position as the sole trier of fact, we are not at liberty to disturb any of its findings which are supported by the evidence. *Green v. State*, 615 S.W.2d 700, 707 (Tex.Crim.App. 1980), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). Additionally, we must uphold the trial judge's decision on a motion to suppress if any theory is supported by the record, even if it does not reflect or indicate that the judge relied upon that theory. *Spence v. State*, 795 S.W.2d 743, 755 n. 11 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 271

(1991); *Sewell v. State*, 629 S.W.2d 42, 45 (Tex.Crim.App.1982).

■ In the instant case, at the hearing on the motion to suppress, Pierce testified when he arrived at the police department on the morning of October 4, 1993, his supervisor told him that a suspect in two robberies he had been working on had been arrested for driving a stolen car. Between 8:30 and 9:00 a.m., he went to the University Medical Center in Lubbock to question the suspect in custody. When he arrived at the hospital, there were at least three other officers standing in the cubicle where appellant was being observed; however, no one was speaking with appellant. Pierce recalled that when he saw appellant, he was in an observation cubicle on a gurney with his hands restrained by leather restraints as he was in police custody. Appellant had an oxygen tube going to his nose and he was awake.

Pierce also testified that he did not have an opportunity to talk with any of the emergency room doctors who may have been treating appellant as there were none in the cubicle when he arrived, nor did any come into the cubicle to treat appellant while he was there. He learned of appellant's alleged medical condition only by asking appellant himself and the other officers that were there.

Pierce maintained that he read the *Miranda* warnings to appellant even before they started talking, appellant appeared to understand his rights, and agreed to talk with Pierce. The detective then filled in all of the necessary information on a standard consent to search form utilized by the City of Lubbock Police Department and explained the significance of the form to appellant. Appellant then signed the consent form with Pierce and one of the other officers signing as witnesses.

The detective denied that he or any other officer made any threats or promises to appellant, instead insisting that he explained to appellant that he was a suspect in two robberies, that he knew where appellant had been staying, and that he wanted to search his room for evidence linked to the two robberies, including any type of weapons. He averred that appellant appeared to be coherent and able to understand what they were talking about and that appellant was awake during the entire conversation, which lasted approximately ten to fifteen minutes.

On cross-examination, Pierce again acknowledged that he did not consult with any of appellant's doctors or review any of appellant's medical records prior to talking with appellant. He estimated that he first saw appellant an hour or two after he had been arrested and that he supposed it would also have been about an hour or two after appellant had taken the alleged overdose of drugs.

Talton English, an officer with the City of Lubbock Police Department, also testified during the hearing on the motion to suppress. He stated that he accompanied Pierce to the hospital to speak with appellant regarding the robbery involved in this case. English recounted that appellant was strapped down on a hospital gurney in one of the emergency room cubicles when he and Pierce spoke with him. He believed appellant was strapped down because he was in custody and wearing handcuffs when he was brought to the hospital.

He further said he was present when appellant was given his *Miranda* warnings as well as when Pierce requested that appellant sign a voluntary consent to search form. He further testified that he saw appellant sign the form and that appellant was "coherent and speaking."

On cross-examination, English admitted that he was just outside the cubicle talking with the other officers during the time that Pierce was speaking with appellant. He also acknowledged that he did not see the consent to search form before appellant signed it. He did not know how long appellant had been in the hospital prior to the time he first saw appellant, nor did he know if Pierce had spoken with appellant's treating physicians about appellant's medical condition. He believed the conversation between Pierce and appellant lasted approximately fifteen to twenty minutes and that the other officers were there to guard appellant and return him to the county jail.

In its ruling, the trial court found that appellant, "on the occasion in question, had been Mirandized" and that the officers' testimony established that appellant "was lucid at the time of giving consent." The trial court then held that "the consent was voluntarily and freely given" and overruled appellant's motion to suppress.

Reiterated, in reviewing a trial court's decision to deny a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Mitchell v. State,* 831 S.W.2d 829, 831 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd). Again, at the suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses as well as the weight to be given to their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990).

In this case, the testimony of the officers as to appellant's lucidity at the time he signed the consent form was not refuted by any evidence put on by appellant. Even though appellant argues that he "was affected by cocaine and amphetamines to the degree his life was in immediate danger" and that he "was so under the influence of narcotics at the time he signed the form, that he was rushed thereafter to I.C.U.,"[3] the record does not show any such testimony. The only testimony as to appellant's medical condition established that he was in a hospital, on a gurney and was being administered oxygen. Indeed, there was no testimony or evidence of any kind before the trial court establishing that appellant had actually taken an overdose of drugs or that he was in the hospital for any other reason than that he told the arresting officers that he had taken an overdose.

The evidence produced at the hearing was amply sufficient to support the trial court's denial of the motion to suppress. As we are bound by a decision of the trial court that is supported by the evidence, we must, and do, overrule appellant's second point.

**3.** Appellant did not testify as to his state of mind at the time the consent form was offered for his signature, nor did he testify as to the drugs, or the amount thereof, that he had allegedly taken prior to his signing the consent form. Moreover,

In summary, both of appellant's points of error are overruled and the judgment of the trial court affirmed.

POFF, J., whose term has expired, not participating.

no testimony or evidence was introduced to establish appellant's condition through any of the doctors who treated appellant or by way of any of his medical records.