# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-08-00718-CR
NO. 03-08-00719-CR

**Jeffrey Todd Cook, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NOS. D-1-DC-08-202690, D-1-DC-08-202691
HONORABLE BOB PERKINS, JUDGE PRESIDING**

# M E M O R A N D U M   O P I N I O N

These two cause numbers were consolidated for trial. In cause number D-1-DC-08-202690, the trial court found appellant Jeffrey Todd Cook guilty of aggravated robbery with a deadly weapon, *see* Tex. Penal Code Ann. § 29.03(a)(2) (West 2003), and assessed punishment at twenty years' imprisonment. In cause number D-1-DC-08-202691, the trial court found Cook guilty of unlawful restraint, enhanced to a third-degree felony by a finding that he recklessly exposed the victim to a substantial risk of serious bodily injury, *see id.* § 20.02(c)(2)(A) (West 2003), and assessed punishment at ten years' imprisonment. In four points of error on appeal, Cook challenges the legal and factual sufficiency of the evidence to support the convictions. We affirm the judgment of conviction for aggravated robbery, modify the judgment of conviction for unlawful restraint to

reflect a class A misdemeanor, rather than a third-degree felony, and affirm the conviction for unlawful restraint as modified.

## BACKGROUND

On May 7, 2008, officers with the Austin Police Department were conducting surveillance on Cook's apartment for the purpose of executing outstanding arrest warrants for Cook. Officer Eric De Los Santos testified that after several hours of surveillance, undercover officers witnessed Cook leave the apartment and enter a gold Mitsubishi.[1] The undercover officers followed Cook in unmarked cars, and then a marked patrol car attempted to stop Cook as he drove along Interstate Highway 35. Rather than stopping, Cook exited the freeway and entered an apartment complex located along the access road to I-35, near Yager Lane. According to De Los Santos, Cook then left his vehicle in the apartment complex parking lot and ran toward the end of the parking lot, jumped the fence, and headed into the wooded area bordering the complex. The officers who were following Cook then attempted to establish a perimeter around the wooded area and requested back-up from Air One, the Austin Police Department helicopter. De Los Santos testified that after about thirty minutes of searching, another officer spotted Cook in a condominium complex on Yager Lane, but that Cook then "took off running, and the officer lost sight of him." After approximately thirty more minutes of searching, the officers learned from a 911 caller that Cook had broken into a unit in the complex.

---

[1] Because of the large number of officers involved in the surveillance efforts, the defense agreed to allow De Los Santos and other supervising officers involved to testify as to their own observations and the observations reported by the officers they supervised, and to waive hearsay objections as to their testimony regarding other officers' observations.

2

Lisa Torres, the victim in this case, testified at trial that she had just gotten out of the shower when she heard police helicopters and sirens outside her apartment. After hearing this commotion, Torres started to get dressed, but was interrupted by what she described as "a big ol' bang on the door." She went into the living room, where she saw Cook standing inside the apartment, looking out the peep hole in the front door. Torres testified that Cook motioned for her to be quiet and told her to put some clothes on. Once Torres was dressed, Cook motioned for her to return to the living room, where he told her again to stay quiet. At that time, Torres noticed that Cook had broken the front door when he forced his way into the apartment and that the door would no longer stay closed. According to Torres, Cook then asked her for a knife and followed her into the kitchen in order to retrieve one. Torres testified, "I opened up the drawer and I got the smallest possible knife I could because I thought maybe he was going to stab me or something." Torres further testified that she did not know what Cook planned to do with the knife, but that after she gave it to him, "[h]e went and he jammed it in the door so the door would stay shut." Cook explained to Torres that he was "on the run from the cops," asked her several times if anyone else was in the apartment, and requested that she show him around the apartment to prove that nobody else was there. Torres testified that as Cook followed closely behind her, walking around the apartment, he appeared to be "very, very paranoid," and "very rabid."

Torres further testified that she asked Cook multiple times if she could leave, but that he refused to let her go, instead insisting that she sit down and be quiet. He also demanded that Torres pour alcohol on his back, which was covered in cuts, or "slashes," according to Torres. At some point, Cook asked Torres to give his girlfriend directions to the apartment over the phone.

3

Torres testified that when she explained to Cook that she did not know how to give directions to the apartment, he became angry and accused her of lying. Torres was eventually able to find a piece of mail listing the correct address of the condominium, which she then relayed to Cook's girlfriend over the phone.

As Cook waited on his girlfriend to come to the apartment, he requested that Torres provide him with black clothes to wear. Torres complied, producing some of her boyfriend's clothes. While Cook was changing into the new clothes, he took a knife out of the pocket of the pants he had been originally been wearing, "held it in his hand for awhile," and then placed it in the pocket of the new pants. Torres testified that she was about three or four feet away from Cook when he took out the knife and that he held it in his hand for ten or fifteen seconds before placing it in his pocket. When asked whether she was afraid when she saw the knife, Torres responded affirmatively and further stated, "Just his state of being, the way he was, real paranoid and scared looking . . . kind of just pacing, you know, looking out the back door and the front door and just thinking somebody is in there . . . throughout the whole time he was very, very scary to me." Torres also testified that when Cook took the knife out of his pocket, "I thought he was going to kill me." Torres was able to identify the knife at trial, stating, "I remember it well."

Shortly after Cook changed clothes, Torres's boyfriend, Steve Vargas, arrived at the apartment. When Vargas knocked on the door, Cook retreated to the kitchen and instructed Torres to let him in. Torres testified that when she opened the door, she pushed Vargas out of the way and said, "[T]here is a man here holding me hostage, leave, let's go." Vargas testified that Torres was

4

"hysterical" when she answered the door, and that "[s]he opened the doors, pushed me away back, and told me, get out, he has a knife."

Torres and Vargas then got into Vargas's car and drove across the parking lot while Vargas called 911. Vargas testified that he stopped the vehicle in a location where he could keep an eye on the front door of the apartment and that Cook began walking toward the car, leading Vargas to pull out a gun that he happened to be carrying with him. According to Vargas, while he had his gun drawn on Cook, another vehicle drove up "and [Cook] jumped in the back seat and they sped off." At that time, Vargas again called 911 and told the operator that Cook was leaving the scene in a white Ford Taurus. The 911 operator then relayed that information to the officers on the scene, who began pursuing the vehicle.

Officer Thomas Lopatowski, who was riding in Air One, testified that he observed a marked police car attempting to stop the Taurus after it left the condominium complex parking lot. Lopatowski testified that the Taurus pulled into the parking lot of a grocery store located along the I-35 frontage road and "[t]he vehicle actually came to a stop for a brief second, and as the officer attempted to get out of his car and approach the vehicle, the vehicle fled." According to Lopatowski, the driver continued to evade the police officers for another twelve to thirteen minutes, causing two traffic accidents in the process. Cook eventually exited the vehicle and began to flee on foot, where he was apprehended by police.

Cook was charged with aggravated robbery, unlawful restraint, and evading arrest. After a bench trial, the trial court found Cook guilty of all three charges, and sentenced him to twenty years' imprisonment for aggravated robbery, ten years' imprisonment for unlawful restraint,

5

and two years' imprisonment for evading arrest, with the sentences to run concurrently. Cook filed notices of appeal of his convictions for aggravated robbery and unlawful restraint, but did not appeal his conviction for evading arrest. In four issues on appeal, Cook argues that there is legally and factually insufficient evidence to support his convictions for aggravated robbery and unlawful restraint.

## STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the fact finder's determination. *See Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). We must then determine whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. *See Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009). In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). We may not reweigh the evidence

and substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

## DISCUSSION

*Aggravated Robbery*

In his first and second points of error, Cook contends that the evidence was legally and factually insufficient to support the conviction for aggravated robbery. Specifically, Cook argues that the State did not carry its burden to prove that he used a deadly weapon in the offense—a finding that elevated the offense from robbery to aggravated robbery, *see* Tex. Penal Code Ann. § 29.03, and limited his eligibility for parole.[2] *See* Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2008); Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2008).

To prove the offense of robbery, the State was required to establish that Cook (1) unlawfully appropriated Vargas's property—his clothes—with the intent to deprive Vargas of the property and (2) in the process, he intentionally or knowingly threatened Torres or placed her in fear of imminent bodily injury or death.[3] *See* Tex. Penal Code Ann. § 29.02 (West 2003). To prove the offense of aggravated robbery as alleged in the indictment, the State had to further establish that

---

[2] If the judgment contains an affirmative deadly-weapon finding under section 3g(a)(2) of article 42.12, a prisoner is not eligible for parole until his actual calendar time served, without consideration for good conduct time, equals one half of the sentence or thirty calendar years, whichever is less. Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2008); Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2008). Without the deadly-weapon finding, a defendant is parole-eligible after serving one-quarter of the time, with credit for good behavior. Tex. Gov't Code Ann. § 508.145(f). Thus, a deadly-weapon finding also requires Cook to serve a substantially longer period than would be required without the finding.

[3] Cook concedes that the State proved these two elements.

Vargas used or exhibited a deadly weapon—a knife—in the process of committing the robbery. *See id.* § 29.03(a)(2). "[A] person 'uses or exhibits a deadly weapon' under the aggravated robbery statute if he employs the weapon in any manner that 'facilitates the associated felony.'" *McCain v. State*, 22 S.W.3d 497, 502 (Tex. Crim. App. 2000) (quoting *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989)).

While two knives were involved in this offense, the trial court appears to have based its judgment on Cook's use of the folding knife in his pants pocket, rather than the kitchen knife he used to hold the door closed.[4] In light of our determination that the evidence is sufficient to uphold a deadly-weapon finding based on the folding knife, we need not also determine whether the evidence is sufficient to make a deadly-weapon finding regarding the kitchen knife.

A knife is not considered a deadly weapon per se. *See Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983). Instead, a knife becomes a deadly weapon if, in the manner of its use or intended use, it is capable of causing death or serious bodily injury. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2008); *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). When no actual injury is sustained, the State must present evidence of other factors to establish that a knife is a deadly weapon. *See Blain*, 647 S.W.2d at 294; *Victor v. State*, 874 S.W.2d 748, 751 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). These factors include (1) the manner of its use or intended use, (2) the size, shape, and sharpness of the blade, (3) implied or express threats made by the accused, (4) the physical proximity of the accused and the victim, (5) testimony regarding the knife's life-threatening capabilities, and (6) the victim's fear of serious bodily injury or death. *See*

---

[4] After closing arguments, the trial court stated, "I'm not really worried about the knife in the door. That is not a big deal to me."

*Blain*, 647 S.W.2d at 294; *Rivera v. State*, 271 S.W.3d 301, 304 (Tex. App.—San Antonio 2008, no pet.); *Victor*, 874 S.W.2d at 751. "Each case must be examined on its own facts to determine whether the fact finder could have concluded from the surrounding circumstances that the knife was used or was to be used as a deadly weapon." *Billey v. State*, 895 S.W.2d 417, 420-21 (Tex. App.—Amarillo 1995, pet. ref'd). In order to establish that a knife was a deadly weapon, the State is not necessarily required to introduce the knife itself into evidence or to provide expert testimony that the knife was capable of causing death or serious bodily injury. *See Rivera*, 271 S.W.3d at 304; *Victor*, 874 S.W.2d at 751.

The evidence can be sufficient to classify a knife as a deadly weapon if it "is displayed in a manner conveying an express or implied threat that serious bodily injury or death will result if the aggressor is not satisfied." *Jones v. State*, 843 S.W.2d 92, 96-97 (Tex. App.—Dallas 1992, pet. ref'd). "Where the victim testifies that he or she was in fear of serious bodily injury or death, a verbal threat by the accused is not required for the fact finder to conclude that threats were actually made." *Billey*, 895 S.W.2d at 422; *see also Tisdale v. State*, 686 S.W.2d 110, 115 (Tex. Crim. App. 1985) (op. on reh'g) (holding that rational trier of fact could find beyond reasonable doubt that knife was deadly weapon where appellant's action of showing knife to victim was perceived by victim as implicit threat).

Several factors that can establish a knife as a deadly weapon were present in this case, including a close proximity between the victim and the accused, an implied threat by the accused, the victim's fear of serious bodily injury or death, and testimony regarding the knife's life-threatening capabilities. The proximity factor was established by Torres's testimony that when Cook

9

produced the folding knife, she was approximately three or four feet away from him. She also testified that he followed closely behind her everywhere she went in the apartment.

Furthermore, in light of Torres's testimony that Cook held the knife in his hand for ten or fifteen seconds while standing three or four feet away from her and that, when she saw the knife, "I thought he was going to kill me," a reasonable fact finder could conclude that Cook made an implied threat to use the knife to inflict serious bodily injury or death. *See Billey*, 895 S.W.2d at 422 (stating that victim's testimony regarding fear of serious bodily injury or death may be sufficient for fact finder to conclude that threat was made, even in absence of verbal threat). This testimony also supports another relevant factor—the victim's fear of serious bodily injury or death. *See Victor*, 874 S.W.2d at 751. Torres's testimony regarding her fear of serious bodily injury or death after seeing the knife is further supported by Vargas's testimony that as soon as he arrived at the apartment, Torres "opened the doors, pushed me away back, and told me, get out, he has a knife."

In addition, the State entered the knife into evidence and presented expert testimony that it was capable of causing serious bodily injury or death. On direct examination, De Los Santos testified as follows:

| State: | Officer De Los Santos, you said you have been an Austin police officer for 20 years approximately? |
|---|---|
| De Los Santos: | Yes, ma'am. |
| State: | And do you have training and experience with regard to weapons? |
| De Los Santos: | Yes, ma'am. |
| State: | And I am going to show you what has been marked as State's Exhibit No. 3. What do you recognize this to be? |

De Los Santos:    A folding knife.

State:    And based on your training and experience, would this folding knife be capable of causing serious bodily injury or death?

De Los Santos:    Yes, ma'am.

Cook argues, however, that De Los Santos's testimony is insufficient because the officer did not actually open and examine the knife blade. On cross-examination, De Los Santos testified:

Defense:    And with respect to State's Exhibit 3 [the folding knife], was this morning here in court the first time you had seen it?

De Los Santos:    Yes, sir.

Defense:    And as I showed it to you now and you just looked at it, you see that, in fact, it is taped up inside a Ziploc baggy. Is that the condition you have always observed it in since this morning?

De Los Santos:    Yes, sir.

Defense:    So when you testified that it was capable of causing serious bodily injury or death, that's a conclusion based on certain assumptions about State's Exhibit 3, not based on any personal examination of that object; isn't that true?

De Los Santos:    That's correct, sir.

The State established, however, that De Los Santos was a twenty-year police officer with training and experience related to weapons. De Los Santos could reasonably have formed an opinion regarding the knife's capacity to inflict serious bodily injury or death based on his training and experience with folding knives similar in exterior appearance to the one used by Cook. *See Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd)

11

(holding that deadly-weapon finding was supported by doctor's testimony that "although he did not see the knife, he considered a small pocket knife to be a deadly weapon and that it is capable of causing serious bodily injury or death").

Cook further complains that the trial court, as finder of fact, did not unfold and examine the knife before making a determination that it should be classified as a deadly weapon. The record does not affirmatively demonstrate whether the trial court actually unfolded the knife.[5] Despite Cook's argument to the contrary, the fact that the knife was taped closed at the time it was forwarded to this Court does not definitively establish that the trial court did not untape it, examine the blade, and tape it closed again. The State explained at trial that the knife was not taped closed at the time it was seized "and it was taped when it was put into evidence. The inference is that it wouldn't stay folded on its own or else they wouldn't have taped it." We note also that the blade of the knife is partially visible even when the knife is taped closed, and that the approximate length and width of the blade could be ascertained by examining it in this manner.[6] In any event, even if the trial court did not unfold the knife and examine the blade, failure to do so would not necessarily be

---

[5] A short discussion was held on the record regarding whether police officers had ever unfolded the knife after retrieving it from Cook, and the trial court stated, "Okay. Do we have State's Exhibit 3 [the folding knife] here? Is this one of these things that I have to use my gloves with or something like that that you-all always use and everything or not?" The State responded, "I don't think so. I spared you the Taser so we wouldn't all have to get our gloves." The trial court then began discussing *McCain v. State*, 882 S.W.3d 497 (Tex. Crim. App. 2000), a case cited by defense counsel during closing argument, and no further mention was made of unfolding or handling the folding knife.

[6] Torres did not testify that Cook ever unfolded the knife in her presence, nor did she testify regarding any perception she may have had of the size or sharpness of its blade. However, a victim need not "be provided with a clear, unobstructed, and complete view of the weapon used in the commission of a crime in order to establish the deadliness of the weapon." *Billey v. State*, 895 S.W.2d 417, 423 (Tex. App.—Amarillo 1995, pet. ref'd) (holding that evidence was sufficient to establish hunting knife was deadly weapon where defendant displayed handle of knife to victim during robbery).

12

dispositive, as the State was not required to introduce the knife into evidence in order to meet its burden of proof. *See Victor*, 874 S.W.2d at 751.

Cook further argues that even if the knife could be considered a deadly weapon, he did not employ the knife in a manner that would facilitate the underlying offense and therefore did not "use or exhibit" a deadly weapon under the aggravated robbery statute. *See McCain*, 22 S.W.3d at 503. In *McCain*, the court of criminal appeals held that the evidence was legally and factually sufficient to uphold a deadly-weapon finding where the appellant had a knife in his pocket during a robbery, but did not touch, brandish, refer to, or overtly display the knife in any way other than having it partly sticking out of his pocket. *Id.* at 499. The court held that the knife facilitated the underlying crime because "its presence was used by appellant to instill in the complainant apprehension, reducing the likelihood of resistance during the encounter." *Id.* at 503. The same is true in the present case.

In determining whether the knife in this case constituted a deadly weapon, and whether it was used or exhibited to facilitate the underlying offense, we must consider the totality of the circumstances. *See Curry v. State*, 674 S.W.2d 495, 498 (Tex. App.—Fort Worth 1984, pet. ref'd) (stating that fact finder "may consider all of the facts of a case" in determining deadliness of weapon). Torres had just finished showering and was not yet dressed when she heard police sirens and helicopters outside her apartment, followed by a loud noise coming from her living room. Upon entering the living room, she discovered that a strange man, likely the source of all the commotion and police activity she had just heard, had broken into the home using enough force to do significant damage to her front door. Shortly thereafter, Torres learned that the intruder was on

the run from police, covered in cuts and scratches, and carrying a knife. He ignored her repeated pleas that she be allowed to leave the apartment, demanded that she provide him with a kitchen knife, which he then shoved into her front door, and required her to supply him with clothes, presumably to facilitate further flight from the police. He also followed her around the apartment, walking closely behind her and acting "very paranoid" and "very rabid." Finally, as Cook was in the act of stealing Vargas's clothes, he held his knife in his hand for ten or fifteen seconds while standing three or four feet away from Torres. As the trial court pointed out at trial, Cook could have transferred the knife from one pair of pants to the other in an inconspicuous manner, concealing it in his hand so that Torres could not see it. Instead, he chose to hold the knife where Torres could see it, making what Torres took to be an implied threat and leading her to believe that Cook was going to kill her. As Vargas testified, Torres was "hysterical" when she escaped the apartment and the first thing she said was, "[G]et out, he has a knife." The trial court was also presented with expert testimony regarding the knife's capacity to inflict serious bodily injury or death. While this is a close case, the appropriate standard of review for determining legal sufficiency is whether "after viewing the evidence in the light in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (1979); *see also Clayton*, 235 S.W.3d at 778. In light of this standard, we cannot conclude that the evidence is legally insufficient to support the trial court's determination that the folding knife was a deadly weapon and that Cook used or exhibited it to facilitate the underlying offense of robbery.

We similarly hold that, viewing the evidence in a neutral light and taking care to avoid reweighing the evidence or substituting our judgment for that of the fact finder, the verdict is

14

not contrary to the great weight and preponderance of the available evidence. *See Sims*, 99 S.W.3d at 601. The evidence is therefore factually sufficient to support Cook's conviction for aggravated robbery. Cook's first and second issues are overruled.

*Unlawful Restraint*

In his third and fourth issues on appeal, Cook argues that the evidence is legally and factually insufficient to establish that while Torres was restrained, he recklessly exposed her to a "substantial risk of serious bodily injury." This element is significant because it elevated Cook's conviction for unlawful restraint from a misdemeanor to a third-degree felony. *See* Tex. Penal Code Ann. § 20.02(c)(2)(A). Cook argues that while Torres testified that she felt threatened, she did not describe any distinct conduct on his part that created a substantial risk of serious bodily injury. We agree.

The statute does not allow a conviction for felony unlawful restraint based solely on the victim's fear of serious bodily injury. Rather the defendant must have recklessly exposed the victim to a substantial risk of serious bodily injury. *Compare id.* (requiring finding that defendant "recklessly expose[d] the victim to a substantial risk of serious bodily injury"), *with id.* § 29.02(a)(2) (offense of robbery requires finding that defendant "threaten[ed] or place[d] another in fear of imminent bodily injury or death").

Under the penal code, "[a] person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c) (West 2003). While Torres testified regarding her own fear while

15

restrained in her apartment with Cook, she did not testify to any specific circumstances surrounding Cook's conduct or any result of Cook's conduct that exposed her to a substantial risk of serious bodily injury. We decline to hold that the exhibition of a knife, even by a seemingly unstable individual, is sufficient by itself to recklessly expose a victim to a substantial risk of serious bodily injury. *See Ransdell v. State*, No. 06-06-00166-CR, 2007 Tex. App. LEXIS 3493, at *17-18 (Tex. App.—Texarkana May 8, 2007, no pet.) (mem. op., not designated for publication) (holding that evidence was insufficient to uphold finding of substantial risk of serious bodily injury, even though bipolar defendant barricaded his family inside house and armed himself with small baseball bat).

We sustain Cook's third issue on appeal and hold that the evidence is legally insufficient to support a finding that Cook recklessly exposed Torres to a substantial risk of serious bodily injury. In light of this holding, we need not reach Cook's factual-sufficiency challenge.

We may reform a judgment to show a conviction for a lesser-included offense if we determine that the evidence is insufficient to support a conviction for the greater offense. *See Watson v. State*, 923 S.W.2d 829, 832 (Tex. App.—Austin 1996, pet. ref'd). Because Cook successfully challenged only the finding that elevates his unlawful restraint conviction from a class A misdemeanor to a third-degree felony, we modify the judgment to reflect a conviction for the class A misdemeanor of unlawful restraint. *See* Tex. Penal Code Ann. § 20.02(c).

## CONCLUSION

We affirm the judgment of conviction for aggravated robbery in trial court cause number D-1-DC-08-202690. We modify the judgment of conviction in cause number D-1-

16

DC-08-202691 to reflect a conviction for unlawful restraint as a class A misdemeanor, rather than a third-degree felony, and affirm the conviction as modified. In addition, we reverse that portion of the judgment assessing punishment and remand for a new punishment hearing in cause number D-1-DC-08-202691.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Modified and, as Modified, Affirmed in part; Reversed and Remanded in part

Filed:   October 9, 2009

Do Not Publish