**Affirmed and Memorandum Opinion filed August 15, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-23-00301-CR

---

**KEVIN AVERY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court
Harris County, Texas
Trial Court Cause No. 1673729**

---

## MEMORANDUM OPINION

Appellant Kevin Avery appeals his conviction for aggravated assault with a deadly weapon. After a mistrial was declared in his first trial, a jury found appellant guilty in a second trial, and following an agreement with the State, he was sentenced to seven years imprisonment, probated for six years. In three issues, appellant contends that (1) he was denied his right to a speedy trial, (2) his conviction was not supported by legally sufficient evidence, and (3) the trial court erred in admitting improper impeachment evidence. We affirm.

## *Background*

Appellant was charged with the aggravated assault of complainant Liliana DiGiorgio with a deadly weapon, namely a knife. Appellant's first trial ended in a mistrial because of a hung jury. At the second trial, there were five key witnesses. Two for the State: complainant and her friend Edgar Gamboa; and three for the defense: appellant, his brother Anthony Avery, and his brother's common law wife, Reanna Ramirez.

Gamboa testified that on May 1, 2020, he was living at an apartment complex in Harris County. Near the apartment complex is a small lake with an island in the middle of it. Gamboa said that he liked to camp on the island on weekends, and on May 1, he got off work around 11 p.m., collected his two small dogs and his camping bag, and headed toward the lake in his boat. At some point after Gamboa set up camp, he noticed another fire on the island and went to investigate, meeting appellant and another man. Gamboa asked them if they were okay and if they lived at the apartment complex. He said that the two men appeared to be intoxicated, accused him of being homeless, and then became aggressive. According to Gamboa, appellant stood up, holding a camping knife with a silver-colored blade. Gamboa ran from the men and attempted to call his roommate but had to leave a voicemail. Upon receiving the voicemail, the roommate called 911, and a recording of this call was played for the jury.

Further, according to Gamboa, when appellant and the other man caught up to him, they took Gamboa's phone and threw it away. They also took Gamboa's Chihuahua from his hands and threw her, too. Appellant then grabbed Gamboa from behind and held the knife to his neck while the other man hit Gamboa in the legs, stomach, and face. Gamboa grew dizzy and started to blackout but continued to struggle and then fell into the water. Gamboa swam to the apartment complex;

2

went to complainant's apartment, which was nearby; and began banging on her door. As he was swimming, he heard the men say, "[l]et's go get him," and when he reached the complex, he could see the men were about halfway across the lake.

After calling 911, complainant allowed the wet and bleeding Gamboa into her apartment. According to Gamboa, complainant then went downstairs alone to look for whoever was chasing him. Gamboa said that from the apartment, he had a good view of the resulting encounter between complainant, appellant, and the other man. Appellant approached complainant and grabbed her arm before putting his own arm around her neck and holding the knife against her neck while asking where Gamboa lived. When police sirens became audible and lights became visible, appellant let complainant go and ran near the lake. Complainant then walked toward the responding officers, and Gamboa came out of complainant's apartment and approached the officers as well.

Photographs of Gamboa's injuries from that night were admitted into evidence. They show bruising and abrasions on his face, chest, arm, and leg. Gamboa said that after the incident, he got a CT scan, saw a doctor monthly and a therapist, and received prescriptions for pain medication and medication to treat anxiety and depression. Gamboa acknowledged having one beer before the incident occurred. An EMS report from that night reflected that Gamboa had been assaulted, declined evaluation, and appeared intoxicated.

Complainant testified that in the early morning of May 2, 2020, she was woken by a booming sound and someone calling her name. She opened her door to find Gamboa, who was "drenched in water and in blood." Gamboa was "freaking out" and said he had been attacked by two men. Complainant called 911, and a recording of the call was played for the jury. According to complainant, she and Gamboa were looking to see if someone had followed him when appellant lunged

3

at her "from the side." Gamboa screamed and ran while appellant grabbed complainant by the arm, put a knife against her neck, and began asking where Gamboa lived. Complainant described the knife as long and thin, "like a fishing knife." Complainant said that she had a bruise on her arm from where appellant had grabbed her, and a photograph was admitted into evidence showing complainant raising her arm to display the bruise. According to complainant, as appellant was holding the knife against her neck, he was threatening to kill her if she did not tell him where Gamboa lived.

Complainant said that she tried to negotiate with appellant and kept him walking toward the lights in the parking lot. According to complainant, when appellant saw other people, he let the knife go down and she took the opportunity to run to her apartment. She then called 911 again, and a recording of this call was also played for the jury. The police arrived about ten minutes after she got freed from appellant. While she was talking to the officers, appellant walked in front of them, and complainant identified him to the officers. Complainant further testified that she feared for her life during the encounter with appellant and that a knife can be a deadly weapon.

Reanna Ramirez testified that she is married to Tony Avery, appellant's brother, and on May 1, 2020, she and Tony had gone to stay with appellant and ride around on the "little pond" beside his apartment complex. They decided to go to the island in the middle of the pond with food and a grill. They set up and started a fire and were sitting around when they saw another man make his way to the island. Sometime later, the man approached where they were sitting and talked to appellant and Tony. She explained that she could not hear their conversation, but it all looked calm. The man left but came back later and offered them some food. She said that Tony and appellant made a couple of trips from the island to get more

4

food, but she left at some point to go to the apartment. She began trying to call Tony and appellant several hours later when they had not returned to the apartment. She eventually reached Tony but not appellant. She and Tony waited at appellant's apartment, but appellant did not return that night. Reanna said that neither appellant nor Tony appeared intoxicated that night.

Anthony Avery, appellant's brother, testified that on May 1, 2020, he and Reanna went to appellant's apartment to then join him on the island. After they were set up on the island, they saw Gamboa approaching across the lake. He later came over to where their group was sitting, and they had "a polite conversation." About twenty to thirty minutes after Gamboa went back to his own camp, Tony took Reanna back to appellant's apartment, where she stayed the rest of the night. Upon his return to the island, Tony said that he saw Gamboa and appellant engaged in conversation. Tony offered Gamboa a beer, which Gamboa accepted and then returned again to his own area.

According to Tony, appellant then said that he did not trust Gamboa and that Gamboa had said that he was homeless and lived on the island. Tony told his brother "don't judge," and suggested they have a beer with Gamboa. The two brothers then went over to Gamboa's campsite and sat around for about thirty minutes drinking beer with him. Tony said that he then manufactured an excuse for the two of them to leave, but as they were packing up their boats, Gamboa was trying to convince them not to go. At some point, Tony realized that a six pack of beer was missing, and he confronted Gamboa about it. At this point, according to Tony, Gamboa's demeanor completely changed, and he became irate. Gamboa charged Tony and threw a punch, which Tony said he "slipped." Tony then punched Gamboa in the face. After Gamboa swung and missed again, Tony hit him a second time. Gamboa then ran, jumped into the water, and swam away.

5

After the fight, Tony said that he told appellant what happened, and they finished loading their boats and headed for the docks. Upon arrival, Tony emptied out his boat and then waited in his truck for appellant. After about fifteen minutes, Tony called Reanna, but she did not want to come out of the apartment because the police were around. Tony made about 20 calls to appellant's cell phone without receiving a response. Ultimately, he and Reanna left and only discovered appellant had been arrested the next day.

Appellant testified that after he, Tony, and Reanna had set up on the island, they saw Gamboa make his way across the water, and, a little while later, he came over to their campsite. Gamboa introduced himself, and appellant and Tony briefly engaged in small talk with him. Thereafter, appellant said that Gamboa went back and forth between the two campsites about three or four times. At some point, appellant returned to his apartment to grab some additional things including a second six pack of beer. After he returned, Tony took Reanna to the apartment. While they were gone, Gamboa again came to the campsite and told appellant that he was homeless and started asking questions that appellant felt were inappropriate regarding where appellant lived.

According to appellant, when Tony returned to the island and appellant told him that he was not comfortable being there with Gamboa anymore, Tony told him not to be judgmental and offered Gamboa a beer. Tony then made an excuse and the two brothers started packing up to leave, but they could not find one of the six packs that they had brought. Tony went to confront Gamboa about the six pack, and when he came back, the two brothers completed packing up and headed out on their boats. The plan was for Tony to take one boat to where his truck was and for appellant to tie his boat near his apartment and then meet Tony to load the other boat in Tony's truck. After unloading his boat, appellant said he was walking down

6

a path when he came across complainant, who asked him what was happening. When appellant explained that someone on the island had taken their beer, he said that complainant's demeanor changed, and she said that she was calling the police on appellant and he was going to jail. Appellant said that he then walked away from her and continued to carry the items from his boat to his apartment. He then headed to the front of the complex to help Tony load his boat. As he was walking past police officers in the parking lot, they detained and arrested him. He was very surprised when he learned the accusations against him.

During cross-examination, over a defense objection, appellant also testified that while his conversations with Gamboa and complainant (at least initially) were peaceful, calm, and nonaggressive, when he was in the back of a police car, he got "pretty aggressive" with a female police officer. Specifically, he acknowledged telling her that she was just a woman and would never be a man, and he said something like "at the end of the day, [he was] going to walk away from this. And at the end of the day, she would just be a woman." He further told her that he "knew that she wished she had a dick between her legs . . . because that would make her a man," and he called her "a stupid fucking woman." He also admitted he may have told the officer that he hoped she died. Lastly, appellant acknowledged he said to the officer, "are you really taking me in for some stupid shit like this[?] He's homeless." Appellant explained that he was being arrested for something that did not happen, the officer had been aggressive toward him, and he "was trying to get under her skin."

As stated above, appellant raises three issues on appeal, contending (1) his right to a speedy trial was violated, (2) the evidence was insufficient to support his conviction, and (3) the trial court erred in admitting his statements to the female officer.

7

# I. Speedy Trial

In his first issue, appellant contends that he was deprived of his right to a speedy trial. The right of an accused to a speedy trial is guaranteed through the Sixth Amendment to the United States Constitution. U.S. Const. amend. VI; *Zamorano v. State*, 84 S.W.3d 643, 647 (Tex. Crim. App. 2002). In addition, Article I, section 10 of the Texas Constitution guarantees the accused in all criminal prosecutions the right to a speedy and public trial. Tex. Const. art. I, § 10; *Zamorano*, 84 S.W.3d at 647. We analyze a speedy trial claim on an ad hoc basis by applying the fact-specific balancing test of *Barker v. Wingo*, which covers the following four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's affirmative assertion of his right, and (4) the prejudice inflicted on the defendant by the delay. 407 U.S. 514, 530 (1972); *Henson v. State*, 407 S.W.3d 764, 767 (Tex. Crim. App. 2013). No single factor is necessary or sufficient to establish a violation of the right to a speedy trial; instead, the court must weigh the conduct of the prosecution and defendant using the balancing test. *Barker*, 407 U.S. at 530; *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008).

The State has the burden of justifying the length of the delay while the defendant has the burden of proving he asserted the right and demonstrated prejudice. *Cantu*, 253 S.W.3d at 280. The reasons proffered by the State to justify any delay serve to determine how heavily such delay should weigh against it. *Zamorano*, 84 S.W.3d at 649. "The defendant's burden of proof on the latter two factors 'varies inversely' with the State's degree of culpability for the delay." *Cantu*, 253 S.W.3d at 280. In other words, the greater the State's bad faith or negligence and the longer its actions delay a trial, the less a defendant must show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id*. at 280–81.

We apply a bifurcated standard of review to a trial court's ruling on a speedy trial claim. *Id*. at 282. We review the factual components for an abuse of discretion, while we review the legal components de novo. *Id*. Review of the individual *Barker* factors necessarily involves factual determinations and legal conclusions, but the balancing test as a whole is "a purely legal question." *Id*. With regard to the trial court's resolution of factual issues, we view all the evidence in the light most favorable to the trial court's ultimate ruling. *Id*.

Dismissal of the charges, "a radical remedy," is appropriate only when an accused's Sixth Amendment speedy-trial right was actually violated. *Id*. at 281. Thus, courts must apply the balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows a defendant's actual and asserted interest in a speedy trial has been infringed. *Id*.

**A. Length of Delay**

The *Barker* test is triggered by a delay unreasonable enough to be "presumptively prejudicial." *Celestine v. State*, 356 S.W.3d 502, 507 (Tex. App.—Houston [14th Dist.] 2009, no pet.). A delay approaching one year from formal accusation or arrest until trial has generally been held to be presumptively prejudicial. *Smith v. State*, 436 S.W.3d 353, 364 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd).

Appellant was arrested and a complaint against him was filed on May 2, 2020, and his first trial, which ended in a mistrial, began on October 25, 2022. That means that 906 days elapsed between charges being filed and the first trial. The second trial began on March 24, 2023, meaning 1056 days passed from charges being filed until the second trial. The record reflects that the trial date was reset eleven times between those dates, with appellant agreeing to six of those and the court ordering the others. Although we exclude the time covered by the agreed

resets from the speedy trial calculation—because agreed resets are inconsistent with the assertion of a speedy trial right—it is clear that the delay in this case not attributable to agreed resets exceeds the one-year threshold. *See id*. at 365. Accordingly, this factor weighs against the State and we must consider the other *Barker* factors. *See id*.

**B. Reason for the Delay**

The specific reasons for the delays determine how heavily the second factor weighs against the State. *Zamorano*, 84 S.W.3d at 649. Intentional delay by the prosecutor will weigh most heavily against the State. *Id*. Delay that is neutral in nature, such as for negligence or overcrowded courts, weighs less heavily against the State. *Id*. Any delay that is determined to be valid should not weigh against the State at all. *See State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999); *Smith*, 436 S.W.3d at 365. When the State has not assigned a reason for a delay, we may presume neither a deliberate attempt to prejudice the defense nor a valid reason for the delay. *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003). The reason for the delay is a fact-specific inquiry and may not be readily apparent from the trial record. *Henson*, 407 S.W.3d at 769.

At the hearing on the amended motion, the trial court noted reasons for the delay, including the COVID pandemic, a backlog of cases, and courthouse construction apparently due to damage from Hurricane Harvey. It is unclear from the record whether the backlog of cases mentioned by the trial court is the result of overcrowded courts or prosecutorial negligence, but either way this would be a neutral reason for delay that would weigh against the State but not heavily. *See Zamorano*, 84 S.W.3d at 649. Appellant does not dispute that delay occasioned by the pandemic and hurricane related construction should fall into the category of valid delay, which would not weigh against the State at all. *See Martinez v. State*,

10

No. 01-22-00390-CR, 2024 WL 2751393, at *21 (Tex. App.—Houston [1st Dist.] May 30, 2024, pet. filed) (mem. op., not designated for publication) ("[T]his Court has concluded that the disruption to the Harris County court system caused by Hurricane Harvey was a valid reason that justified delay."); *State v. Conatser*, 645 S.W.3d 925, 930 (Tex. App.—Dallas 2022, no pet.) ("Delay caused by the onset of a pandemic cannot be attributed as fault to the State."). We need not make a definitive ruling on these matters here; to the extent these reasons may weigh against the State, they do so only slightly. *See Laird v. State*, — S.W.3d —, No. 03-21-00631-CR, 2023 WL 8852509, at *5–6 (Tex. App.—Austin Dec. 22, 2023, pet. ref'd) ("To the extent that the pandemic and related court closures weigh against the State, they do so but slightly."). Delay specifically occasioned by the mistrial would also constitute valid delay not chargeable to the State because it was the result of a hung jury. For the reasons given, the second factor weighs against the State but not heavily.

### C. Assertion of the Right

When and how a defendant asserts his right to a speedy trial is entitled to strong weight in determining whether the defendant is being deprived of the right. *Cantu*, 253 S.W.3d at 283. A defendant's failure to diligently seek a speedy trial can be an indication that he does not want one. *See id.*; *see also Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003) ("[A] defendant's failure to make a timely demand for a speedy trial indicates strongly that he did not really want one and that he was not prejudiced by not having one."). Thus, a defendant's inaction weighs more heavily against finding a violation the longer the delay becomes. *Shaw*, 117 S.W.3d at 890.

Here, appellant filed his original motion for a speedy trial on August 25, 2022. That first motion came 845 days after appellant was arrested and charged.

11

Although there is no indication in the record that appellant brought that motion to the court's attention, it is important to note that the first trial started exactly two months after the filing of the motion. After the mistrial was declared on October 31, 2022, appellant then filed an amended motion on January 13, 2023. A little over two months after that, the second trial began on March 26, 2023. It is also important to note again in this context that appellant agreed to most of the trial resettings. Appellant asserts that there is no evidence that he affirmatively wanted the delays in the proceedings, but there is also little evidence that he desired a quick resolution. *See Smith*, 436 S.W.3d at 366 (noting that long delay in demanding a speedy trial and repeatedly acquiescing in resetting trial cuts against showing an assertion of the right). Appellant's long delay in asserting his right weighs strongly against him. *See Kelly v. State*, 163 S.W.3d 722, 729 (Tex. Crim. App. 2005) (concluding factor weighed against appellant when assertion of right was tardy and trial occurred two months after); *Dragoo*, 96 S.W.3d at 315 ("In view of the lengthy delay here, in which appellant quietly acquiesced, this factor weighs very heavily against finding a violation of the speedy trial right.").

### D. Prejudice

Prejudice is measured in light of the interests that the speedy trial right was designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. *Zamorano*, 84 S.W.3d at 652. The defendant has the burden to make some showing of prejudice, although a showing of actual prejudice is not required. *Munoz*, 991 S.W.2d at 826; *Smith*, 436 S.W.3d at 367.

Appellant acknowledges that there is no evidence in the record indicating that he was incarcerated pending trial. Instead, he argues that the delays caused him significant anxiety, concern, and financial hardship, and impaired his defense.

In his motion to set aside the indictment and dismiss the case, appellant asserted he had suffered substantial anxiety and concern, was seeing a psychologist, and was taking anti-anxiety and sleep medications. He further insisted that he had been turned down from jobs because of the pending cases, he had to pay a second bond, his TWIC card application was "being denied" (although he did not state that this was the result of the delays), and Tony and Reanna would not be available to testify at a second trial. At the hearing on the motion, appellant testified that the statements in the motion were "true and correct" but otherwise provided no additional details or documentation regarding the alleged anxiety, concerns, or financial difficulties. Regarding Tony and Reanna's availability, appellant explained that Reanna was suffering from pregnancy complications and Tony was the only one who could care for her and their first child.

During the hearing, the trial court expressed significant concerns regarding the lack of evidence to support appellant's claims of prejudice, noting the overall dearth of information, appellant's lack of personal information regarding Reanna's condition, the absence of medical records, the lack of subpoenas, and the lack of any request for accommodations. As mentioned above, in regards to factual matters, we view the evidence in the light most favorable to the trial court's ultimate ruling. *See Cantu*, 253 S.W.3d at 282. The evidence appellant provided does not support his claim that he suffered serious prejudice from the delays. This factor therefore weighs against appellant.

### E. Balancing the *Barker* Factors

While the first two factors—the presumption of an unreasonable delay and the State's failure to provide valid reasons for all of the delay—support appellant's position to a degree, the last two factors do not. Appellant's slow assertion of the right weighs heavily against him, as does the fact that he failed to produce

13

evidence of significant prejudice. We conclude that the weight of the four factors, balanced together, is against finding a violation of appellant's right to a speedy trial. *See Barker*, 407 U.S. at 534 (concluding defendant's right to speedy trial was not violated when he was not seriously prejudiced by five-year delay between arrest and trial and did not appear to really want a speedy trial); *Dragoo*, 96 S.W.3d at 308 (holding defendant's right to speedy trial was not violated when he demonstrated no serious prejudice by three-and-one-half-year delay between arrest and trial and he waited until just before trial to assert his right). We overrule appellant's first issue.

## II. Sufficiency of the Evidence

In his second issue, appellant challenges the sufficiency of the evidence to support his conviction. In reviewing the sufficiency of the evidence, we view all the evidence presented at trial in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id*. This standard applies equally to both circumstantial and direct evidence. *Id*. Each fact need not point directly and independently to the appellant's guilt so long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Among other possibilities, the State may prove the offense of aggravated assault by showing that the defendant committed an assault—intentionally, knowingly, or recklessly causing bodily injury to another or threatening another with imminent bodily injury—and that the defendant used or exhibited a deadly weapon during the commission of the assault. Tex. Penal Code §§ 22.01(a), 22.02(a). In this case, the State alleged that appellant did "intentionally and knowingly threaten Liliana DiGiorgio with imminent bodily injury by using and exhibiting a deadly weapon, namely, a knife."

## A. Alleged Inconsistencies

Most of appellant's argument under issue two is spent recounting perceived inconsistencies in and between the testimonies of complainant and Gamboa, including (1) Gamboa's differing statements regarding when complainant let him into her apartment that night; (2) complainant and Gamboa's differing accounts regarding whether he went with her to look for his attackers or locked himself in her apartment before she was assaulted; (3) complainant and Gamboa's differing accounts regarding when appellant lowered his knife (at the sight and sound of police vehicles or when other people came near); (4) a disagreement in complainant and Gamboa's testimonies regarding whether he had invited her to the island that night; (5) the fact Gamboa said he had consumed only one light beer that evening but the EMS report stated he was intoxicated; and (6) the fact the EMS report stated Gamboa had declined evaluation but Gamboa testified he only said that to police officers, not EMS. These alleged inconsistencies, however, are well within the province of the jury to parse. *See, e.g.*, *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence."); *Martinez v.*

15

*State*, 633 S.W.3d 698, 707 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). The State is not required to present perfect evidence for a conviction to stand. *See Hooper*, 214 S.W.3d at 13 ("Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.").

## B. Deadly Weapon

Appellant additionally complains that the State did not present sufficient evidence to establish that the knife he allegedly used during the encounter with complainant was a deadly weapon. "A knife is not a deadly weapon per se, but the State may 'prove a particular knife to be a deadly weapon by showing its size, shape, and sharpness, the manner of its use or intended use, and its capacity to produce death or serious bodily injury.'" *Clark v. State*, 444 S.W.3d 671, 678 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (quoting *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983)). Expert testimony is not required. *Id*. A jury may consider all of the facts of the case in determining the deadliness of a weapon. *Id*.

Here, the evidence regarding the knife allegedly possessed by appellant included Gamboa's testimony that it was a camping knife with a silver handle as well as complainant's testimony that it was "like a fishing knife" with a long, thin blade. Both also testified that appellant used the knife to threaten them by holding it against their necks; complainant even said appellant told her he was going to kill her while holding the knife to her neck if she did not tell him where Gamboa lived. Complainant testified that this made her fear for her life. The jury could have concluded from this that appellant, complainant, and Gamboa each believed the knife was capable of causing death or serious bodily injury, as appellant used the knife to threaten them (to threaten to kill complainant, specifically) and complainant and Gamboa felt imperiled by the threat. Moreover, the jury could

have concluded that a long, thin, camping or fishing knife could be used to cause death or serious bodily injury. Accordingly, the evidence was sufficient to support the conclusion that appellant used or exhibited a deadly weapon in the assault. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000) ("[O]bjects used to threaten deadly force are in fact deadly weapons."); *Sauls v. State*, No. 14-17-00239-CR, 2019 WL 2535995, at *4 (Tex. App.—Houston [14th Dist.] June 20, 2019, no pet.) (mem. op., not designated for publication) ("Evidence is sufficient if a knife is displayed in a manner conveying an express or implied threat that serious bodily injury or death will be inflicted if the desire of the person displaying the knife is not satisfied.") (citing *Billey v. State*, 895 S.W.2d 417, 422 (Tex. App.—Amarillo 1995, pet. ref'd)).

As set forth in detail above, the State produced two eyewitnesses in this case who testified that appellant grabbed complainant, held a knife to her throat, and threatened her. The evidence also suggested a motive for his doing so, i.e., to force her to tell him where Gamboa lived. Complainant stated that she feared for her life. The evidence was sufficient to support appellant's conviction for aggravated assault. *See Gear*, 340 S.W.3d at 746. We overrule the second issue.

### III. Admission of Evidence

In his third issue, appellant contends that the trial court erred in its admission into evidence of statements appellant made to a female officer. As recounted in detail above, during cross-examination, appellant testified that he got "pretty aggressive" with the officer, calling her "a stupid fucking woman" and suggesting she wishes she was a man, among other things.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). If the trial court's ruling falls within the zone of reasonable

disagreement, we will affirm that decision. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). An evidentiary ruling will be upheld if it was correct on any theory of law applicable to the case. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016).

To successfully complain of error on appeal, an appellant must have preserved any error in the trial court by making a timely and sufficiently specific motion, request, or objection and then pursuing it to an adverse ruling. Tex. R. App. P. 33.1; *Musgrove v. State*, 425 S.W.3d 601, 607–08 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). The complaint of error on appeal must comport with the objection made at trial. *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014).

Appellant makes three arguments regarding the admissibility of this evidence, asserting that the evidence (1) was not relevant, (2) was more unfairly prejudicial than probative, and (3) constituted evidence of character to show that he acted in conformance with that character in committing the charged offense. The State initially argues that appellant did not preserve the third argument by presenting it in the trial court, and we agree. This argument is based on Texas Rule of Evidence 404(b), but appellant neither cited that rule nor otherwise made such argument to the trial court. Tex. R. Evid. 404(b)(1). Accordingly, the argument was not preserved for our review. Tex. R. App. P. 33.1; *Bekendam*, 441 S.W.3d at 300; *Musgrove*, 425 S.W.3d at 607–08. We therefore turn to the first two arguments concerning relevance and whether the evidence was more unfairly prejudicial than probative.

Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence is

18

admissible except as otherwise provided by a governing constitution, statute, or rule. Tex. R. Evid. 402. Among the governing rules, relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403.

In considering whether the probative value was substantially outweighed by the danger of unfair prejudice from its admission, we begin with the presumption that the probative value of relevant evidence substantially outweighs any danger of unfair prejudice from its admission. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990); *Le v. State*, 479 S.W.3d 462, 471 (Tex. App.—Houston [14th Dist.] 2015, no pet.). It is therefore the defendant's burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value. *Le*, 479 S.W.3d at 471. In reviewing trial court's balancing determinations under Rule 403, we reverse only rarely and upon a clear demonstration of abuse of discretion. *Id*. In conducting a Rule 403 analysis, a court must balance (1) the probative force of the evidence and (2) the proponent's need for that evidence, against any tendency of the evidence to (3) suggest decision on an improper basis, (4) confuse or distract the jury from the main issues, or (5) be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018).

As stated, appellant first argues that the evidence was not relevant. More specifically, he asserts that there was no evidence that he assaulted complainant because he was a misogynist (as the statements could be read as misogynistic) and the statements to the police officer do not demonstrate that it was any more or less

likely that he assaulted complainant. As the State points out, however, appellant's statements while in the back of the police vehicle shortly after his encounters with complainant and Gamboa were relevant to show appellant's demeanor and state of mind that night. This evidence was particularly important because in his earlier testimony, appellant portrayed himself as calm and nonaggressive in both his interactions with complainant and Gamboa, and Tony's testimony had portrayed appellant as calm that evening and Gamboa as being aggressive and unreasonable. The statements in question were material to and probative of appellant's demeanor and state of mind around the time of the offense. *See* Tex. R. Evid. 401; *see also Marcee v. State*, No. 08-18-00148-CR, 2020 WL 4047970, at *4 (Tex. App.—El Paso July 20, 2020, no pet.) (mem. op., not designated for publication) (holding trial court did not err in admitting video showing defendant engaging in aggressive and abusive behavior toward officer after her arrest, noting it tended to make more probable the fact that she was the aggressor in the earlier confrontation).

Regarding the first two factors in the Rule 403(b) balancing test—i.e., the probative force of the evidence and the proponent's need—appellant essentially repeats his argument that the statements served no legitimate purpose, but, as just described, the evidence served to show appellant's demeanor and state of mind on the night in question and cast doubt on his prior assertions that he was the calm, nonaggressive party in both his encounters with Gamboa and complainant. In a case where there was no video and no unaffiliated witnesses, such evidence may have played an important role in the jury's deliberations. These factors therefore strongly favor admission. *See Gonzalez*, 544 S.W.3d at 372; *Marcee*, 2020 WL 4047970, at *4.

Regarding the third through the fifth factors—i.e., any tendency of the evidence to suggest decision on an improper basis, confuse or distract the jury, or

be given undue weight by an unequipped jury—appellant argues that admitting the evidence in question: (1) invited the jury to convict appellant on a moral or emotional basis rather than the facts of the case; (2) likely distracted the jury due to the inflammatory nature of the statements; and (3) occurred without proper context, possibly leading the jury to assign it undue weight. Although the nature of the evidence at issue certainly may have angered or upset some jurors, it must also be noted that the State did not offer this evidence without context. The prosecutor expressly connected appellant's abuse toward the officer with his claims that he had been calm and nonaggressive in his encounters with complainant and Gamboa that same night. Additionally, appellant was able to provide an explanation for his conduct when he testified that he was angry at having been arrested and "was trying to get under [the officer's] skin." Because of the inflammatory nature of the statements, these factors weigh somewhat in favor of the exclusion of the evidence.

Lastly, regarding the sixth factor, concerning time to present and whether the evidence was needlessly repetitive, appellant acknowledges that the evidence in question did not take long to present. It was also clearly not repetitive of other evidence. These factors therefore favor admission.

Looking at the entirety of the 403 balancing factors in this case, we conclude that the evidence in question was clearly probative of material facts and the State had a need for the evidence to counter appellant's testimony regarding his demeanor and state of mind on the night of the offense. While the inflammatory nature of the statements may have generated emotional responses in some jurors or caused some distraction, the evidence was not offered without context and the statements were not so inflammatory as to outweigh the probative value of the evidence. *See Gonzalez*, 544 S.W.3d at 372; *Marcee*, 2020 WL 4047970, at *4. The trial court's admission of the evidence was within the zone of reasonable

21

disagreement; therefore, we overrule appellant's third issue. *See Moses*, 105 S.W.3d at 627.

## *Conclusion*

Having overruled each of appellant's issues, we affirm the trial court's judgment.


/s/    Frances Bourliot
       Justice


Panel consists of Justices Jewell, Bourliot, and Poissant.

Do Not Publish — TEX. R. APP. P. 47.2(b).